IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

WESTERN DISTRICT—PITTSBURGH 1861.

## McGinnis *et al. versus* Watson *et al.*

*Religious Societies, Constitutional Rights of, as to Internal Laws and Regulations.—Title to Church Property of divided Congregation, by whom held.—Authority of Synods, how far binding.—What Modification of Religious Doctrines will occasion Forfeiture of Church Property.*

1. Under the Constitution of Pennsylvania every religious society has its laws within itself, as to its own internal order and the mode in which it fulfills its functions, provided it keep within the bounds of social order and morality. Independent churches have their law in their own separate institutions: associated churches, theirs, in their own rules and in those of the associated organism.

2. The title to the church property of a divided congregation, is in that part of it which is acting in harmony with its own law; and the ecclesiastical laws, usages, customs, and principles which were accepted among them, before the dispute began, are the standard for determining which party is right.

3. The act of a synod is binding upon the congregations composing its members, so far as the act is in accordance with its own laws: in general organizations of united synods or churches, the law of the general organism is binding on all the individual congregations; and a majority of a single congregation, dissenting from the act of union, and seceding therefor, lose all their rights to the church property.

4. A congregation of the Associate Seceder Church of North America, purchased in 1803 a lot of ground, erected a meeting-house thereon, and continued

to worship therein until 1858, when the synod to which it belonged by a large majority formed a union with the Associated Reformed Synod. A majority of the congregation and the presbytery to which it belonged approved of the union, but a minority disapproving, claimed the lot and meeting-house, because of their adherence to the opinions and principles of the original church: *Held*, that as authority to legislate upon the doctrines, forms, and practice of that church, was one of its most obvious principles, as evidenced by frequent and material changes therein; as the objections of the minority of the congregation to the act of union, assumed a degree of strictness and rigidity of doctrine too minute for the law to appreciate and take cognisance of; and as the action of the synod and presbyteries, as exhibited in the evidence, when judged by the constitution and usages of that church, had not been brought about by any excess of usual and legitimate authority on their part; the act of union therefore, of the Associate Seceder Synod of North America with the Associate Reformed Synod, was not such a departure from its ancient usages and laws, as would condemn its action; and, consequently, the majority of the congregation approving of the union, were the regular and legitimate succession of associate owners, and the part acting in harmony with its own laws, and as such were entitled to the edifice and ground of the meeting-house.

APPEAL from the Common Pleas of *Butler county*.

This was a proceeding in equity on a bill filed in the Common Pleas, to June Term 1860, No. 1, by James J. McGinnis, Charles Pollock, and John Wilson, trustees and members of the United Congregation of the Associate Church, against Robert Watson, William Moore, and Joseph Sloan, trustees of the United Presbyterian Congregation of Unity Church.

The following are the material facts of the case, as contained in the bill and answer filed by the parties:—

Unity Congregation, Venango township, Butler county, was organized in the year 1800, the Rev. Thomas McClintock, of the Associate Church, being the pastor. Its members were of the Associate Church, and in ecclesiastical connection with the Associate Synod of North America; and so continued until the union of 1858 between the Associate and Associate Reformed Churches.

In 1803, Robert Leason, by agreement in writing, sold to "James Scott and Reuben Irwin, trustees for Rev. McClintock's Congregation, two acres of land, including the meeting-house and spring near it, for the proper use and behoof of the congregation, to have and to hold for ever."

In 1833, the former article being supposed to be lost, Leason, by a second writing, agreed to sell and convey to persons named therein, "trustees legally chosen for said congregation," two acres and twenty perches of land, by metes and bounds, "including the brick meeting-house and burying-ground," in consideration of $22.55, and to "give immediate possession, and to give the said trustees or successors, for the use of the said Unity Congregation for ever, a complete and perfect title. A postscript to this writing, signed by Leason, states the loss of the former, and that this is signed to secure the Congregation of Unity in the same property,

in a slightly different shape. In 1836, Leason receipted for the purchase-money in full.

After the union, by an Act of Assembly approved March 29th 1859, that portion of the congregation entering into the union, were incorporated under the name of "The United Presbyterian Congregation of Unity Church of Venango township in the County of Butler." To this incorporation, Leason conveyed the premises by deed dated August 4th 1859.

In May 1856, the Associate Synod of North America approved of a basis of union with the Associate Reformed Church, which was sent to the Associate Reformed Synod for approval, and also overtured to the Presbyteries and Sessions of the Associate Church.

In May 1857, a large majority of the Presbyteries approving the Associate Synod, by a vote of 104 to 13, adopted the basis, the declaration without amendment, and the argument and illustration, in their amended form, and transmitted it to the Synod of the Associate Reformed Church, then in session, which adopted it in confidence of future amendments being made, to harmonize the faith and practice of the two churches, and that reasonable forbearance will be exercised to those constrained to dissent from any article in the basis.

On receipt of this resolution of the Associate Reformed Synod, the Associate Synod reciprocated this confidence of forbearance, with the proviso that no one be permitted to teach or to act in opposition to the doctrine and order of the church. A committee from each Synod was appointed to make arrangements for the union, who reported to their Synods in 1858. In May 1858, the Synods respectively acted on the report, and finally united on it in a slightly amended form. The preamble consisted of two sections; one reciting the understanding that the basis should be a term of communion, and the other the forbearance to be exercised toward the brethren who could not fully subscribe to the standards of the United Church. The union was forthwith formally consummated with proper ceremony, under the name of the United Presbyterian Church of North America. The Synods of the respective bodies were continued for certain special purposes. The Associate Synod, including the Moderator, adjourned on its own motion to Xenia, Ohio, in May 1859. By the proof, it appears that seven ministers of the Associate Synod protested against the act of union. In the Minutes 1858, pp. 86 and 88, the protest of Revs. McAuley, Hindman, and others appears to have been read and filed.

The Presbytery of Indiana (according to the proof), after consulting the protesting members of Synod, called a Synod of the Associate Church, composed of the protestors, to meet in Canons-

[McGinnis *et al. v.* Watson *et al.*]

burg, Pa., in 1859, the witness, Rev. McAuley, being one who signed the call.

The Presbytery of Clarion, composed of the Revs. Hindman and McAuley, and two or three elders, became subordinate to the Synod of the Associate Church, called and held at Canonsburg by those who protested. That portion of the Unity Congregation which refused to go into the union, petitioned the Presbytery of Clarion for a minister, and accordingly the Rev. John M. Snodgrass was duly installed, and a communion held by him, with the assistance of Rev. McAuley, in August 1858.

In reply to the overture of 1856, the Shenango Presbytery of the Associate Church, to which Unity Congregation was attached, reported to the Synod of 1857, its unanimous adoption of the basis of union. The session of Unity Congregation, at a meeting in February 1857, composed of the pastor and the elders, approved of the basis, "with some small emendations." This basis had previously been read from the pulpit for information; and printed copies were in circulation in the congregation. No formal meeting or election was held by the congregation, to act upon the basis. Unity Congregation, at the time of union 1858, had about one hundred and thirty members, of whom about seventy-three went into the union, and held possession of the premises in controversy. About fifty-eight, including several suspended members, refused to go into the Union. The bill, in this case, is presented in behalf of this minority, against the majority of the congregation, to regain possession and control of the church property, on the ground that the grant by Robert Leason was to a congregation professing the doctrines and adhering to the government of the Associate Church according to its standards as they existed in 1803, and that the union is such a departure from these, that the dissenting members cannot be compelled to follow.

On the 19th of July 1860, James Bredin, Esq., was appointed examiner, by whom testimony was taken and filed, and the cause set down for argument at December Term 1860. On the 8th of December, the case was argued, and the opinion and decree of the court (AGNEW, P. J.) filed April 6th 1861. Exceptions were then taken to the form of the decree, which, on argument, were overruled, and the following ordered to stand as the decree of the court, viz.:

"And now, to wit, December 8th 1860, this cause came on to be heard, and was argued by counsel, and was held under the advisement of the court until the March Term of said court. And now, to wit, March 30th 1861, the court having advised upon the said cause, upon consideration thereof, it is ordered, adjudged, and decreed as follows, to wit: That the said United Presbyterian Congregation of Unity Church, of Venango township, in the county of Butler, and all the members, officers, and trustees thereof, and

all the ministers thereof, both stated and temporary, shall be and are hereby strictly enjoined and restrained from the possession and use of said meeting-house and two acres of ground, in the bill mentioned and described, for the purpose of worship as a United Presbyterian congregation; and that the complainants and all other members of the congregation of the Unity Associate Church in the said township and county, who adhere to the ancient faith and practice and ecclesiastical connection of the said Associate Church, as the same was and existed in the said Unity Congregation of the Associate Church, at and before the union of the Associate Synod of North America and the Synod of the Associate Reformed Church, shall be, and are hereby ordered to be restored to the possession, use, and free enjoyment of the said meeting-house and lot, as fully and entirely as they used and held the same prior to the said union, and to have, use, and enjoy the same without any let, hindrance, or molestation from the said United Presbyterian Congregation of Unity Church. And it is further ordered and decreed that the respondents pay the costs of this proceeding, to be taxed and allowed according to the rules and orders of the court."

The case was thereupon removed into this court by the respondents, for whom the following errors were assigned:—

1. The court below erred in deciding that a change of doctrine produced a forfeiture of property.

2. In deciding that in the basis of union there was a departure from the faith, principles, and discipline of the Associate Church.

3. In deciding against the power through the church judicatory to constitute the union.

4. In decreeing the exclusive possession of the property to the complainants.

5. In enjoining in said decree the ministers and members of the United Presbyterian Church from the use of the building and grounds as a place of public worship.

6. In decreeing under all the circumstances in favour of the complainants.

The case was argued in this court by *S. A. Purviance* for the appellants, and by *Lewis Z. Mitchell* for appellees; but the review of the principles and authorities cited and relied on in the opinion of this court, renders a report of the argument of the learned counsel unnecessary.

The opinion of the court was delivered, May 8th 1862, by

LOWRIE, C. J.—About 1803, the Unity Congregation, belonging to the Associate or Seceder Church of North America, purchased a lot of ground in Venango township, Butler county, and erected a meeting-house upon it, and there continued to worship God in

[McGinnis *et al. v.* Watson *et al.*]

unity until 1858. Then the Seceder Synod of North America, by a very large majority, and after many years' consideration, formed a union with the Associate Reformed Synod; and a majority of the Unity Congregation, and the Shenango Presbytery, to which it belongs, have approved of the union thus formed. A minority of the congregation, and several ministers of the Associate Church, disapprove of it, and the minority of the congregation claim the lot and meeting-house. Which party is entitled to it? The Common Pleas decided in favour of the minority: is this right?

Our fundamental law on this subject is written in the Constitution, Art. 9, § 3. All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences, and no human authority can, in any case whatever, control or interfere with the rights of conscience.

Of course this law was not intended to exempt any religious society from the respect that is due to the organization and moral. and social order of the state, or from the necessity of holding its land under the state, and according to its laws. But it does mean, that, for its own internal order, and for the mode in which it fulfils its functions, it is to be a law unto itself, or have its law within itself, provided it keep within the bounds of social order and morality. This is the same rule that the law applies to individuals in their contracts about legitimate business. Their contracts and their own interpretation of them, so far as they can be ascertained, and the customs of the trade in which they are engaged, are the elements out of which we derive the law of the case which they present for our decision.

In its most general form, therefore, our question is: Judging this congregation by its own order, was its union with the Associate Reformed Church, and incorporation into the United Presbyterian Church, regular?

But this raises another question: How far is the congregation bound by the act of its Synod? Religious societies are not free, if they may not choose their own form of organization. They may organize as independent churches, and then their law is found in their own separate institutions, customary or written. Or they may organize as associated churches, and then their law is to be found in their own rules, and in those of the associated organism. When persons join a church belonging to such a general organism, they assent to its laws, and are entitled to the implication that the affairs of the church are to be managed according to them. This result of our law and of the relations of associates in churches, is so clear, obvious, and necessary, that we need not dwell upon it.

It has, however, a qualification already alluded to in general, which ought, perhaps, to be more specially stated. If the general organism extend over several states, it may require much more

than ordinary charity, prudence, and discretion in directing its legislation and action so as to preserve its sphere of influence and usefulness in its integrity. If it should make terms of communion, or adopt a course of ecclesiastical action in any form, that is hostile to the policy of one or more of the states embracing its churches, it may induce a perfectly lawful division; for no state can help to sustain an organism that it judges to be hostile to its own principles, and none of its citizens can be presumed by law to have intended to concede authority for such hostile action. It was under the influence of this principle that our American churches separated from their mother churches in England, Scotland, and Holland before and after our revolution, without being chargeable with secession. It has also divided many of our churches, between north and south, or excluded them altogether from any foothold in the south. The Church of Rome was in many instances saved from such a division, by submitting to laws, as in England, or by entering into concordats with states, by which its ecclesiastical action was greatly restrained by subjection to civil law.

We state this limitation merely by way of precaution; for it is not needed in this case. But, subject to this limitation, our question may now be more specially stated thus: Has the act of union of the Associate and the Associate Reformed Synods been so conducted, that, judged by the law of this congregation, and of the general organism to which it belongs, it can now be properly declared to be a member of the United Presbyterian Church? The congregation was divided by the act of union; and that part of it which is acting in harmony with its own law must be approved and sustained by the state law. That one of them has obtained a charter of incorporation, has no influence on the question, and is not pretended to have. The title depends upon the legitimate, orderly, and regular maintenance of the organized congregation, or succession of associate owners.

We desire it to be noticed that, in this statement of the question, we adopt fully the view of Lord Chancellor Eldon in the case of The Attorney-General *v.* Pearson, 3 Meriv. 400, relative to the usage or customs of the congregation, as the law of the case; while we do not adopt his view in treating it as a trust created by the vendor, and to be used according to his intention. No doubt there are cases where such titles are really trusts, by reason of donations for special purposes; but this is not so often found in cases of church property as in gifts for charitable uses. Questions of this kind have often been obscured by treating them as trusts by the grantor. It is quite natural to call them so, because the rights under them have been usually enforced in equity as trusts. They are analogous to trusts strictly so called, but not identical with them in every aspect. As between the trustees

[McGinnis *et al. v.* Watson *et al.*]

holding the legal title, and the congregation holding the equitable title, they are trusts. But as between the congregation and any other person, they are simply titles.

In the case of The Methodist Church *v.* Remington, 1 Watts 226, Chief Justice Gibson treated such a title as a trust; but as one not created by the vendor, but by the persons paying the purchase-money, and resulting to them on a failure of the purpose; and, therefore, we may say, belonging to them so long as they keep up the regular organization and purpose. And this court has taken this view expressly in three different decisions : 3 Harris 500 ; 5 Id. 96 ; 9 Casey 424 ; the first of which was by Chief Justice Gibson, and the second of which he participated in and heartily approved. The same is decided in Gibson *v.* Armstrong, 7 B. Mon. 481. That it is not a trust, but a title in the congregation, when property is purchased by itself for its own use, is quite manifest from the Act of 1731, under which this purchase was made, which contemplates only titles, and from the facts that the property may be sold by the congregation, or by the sheriff for its debts; the change of its creed violates no duty to the grantor, and the title does not revert to him on a dissolution of the society.

In Craigdallie *v.* Aikman, 1 Dow's Parl. Rep. 1, Lord Eldon laid down the rule that a congregation's title depends upon its adherence to the opinions and principles in which it had originally united, and this has been followed and repeated in many cases. But we should grievously misapply this rule if we should interpret it as meaning that no congregation can change any material part of its principles or practices without forfeiting its property. This would be imposing a law upon all churches that is contrary to the very nature of all intellectual and spiritual life; for it would forbid both growth and decay; not *prevent*, for that is impossible. The guaranty of freedom to religion, forbids us to understand the rule in this way.

And all history forbids it. Let us be indulged in so much detail, in the illustration of this, as is necessary to make the principle clear by means of the facts which it has produced. Many of the principles of human action depend so closely upon the peculiar development of a given people that they are not susceptible of clear illustration, except by instances and cases drawn from the conduct, life, and history of that people. But, on the other hand, very many of them are so common to all humanity that any illustration of them must be inadequate that does not embrace a wide sphere of human conduct both in time and space.

The principle is, that all intellectual or spiritual growth involves some change or development of opinions, principles, and practices, and therefore some change in the systems which are constituted of those opinions, principles, and practices; for these are the ele-

ments of systems, and decide their character. And the *fact* is, that from the very origin of Christianity, such a change has been continually going on in the Christian Church, in all its branches, congregations, and members, without producing a forfeiture of the property held even by those in which the change has been most decided. Changes in principles and practice are not incompatible with legitimate social succession, but are necessary elements of its normal progress. All denominations admit that all others must change in the progress towards union, even though they may suppose their own system too perfect to undergo any change.

Let the facts of history prove this legitimate progress; and, as we cannot answer for the exact accuracy of the history of any of them, let us be satisfied with approximate and general accuracy, and make our principle sure by the number and variety of the instances which illustrate it. Any one can add to them at pleasure.

It will not be pretended that the Jewish Church would have lost its legitimate succession, and its synagogues, if it had generally believed in the Messiah and become Christian, for this would have been a proper spiritual growth within the limits of social identity. For three centuries the Christian Church was entirely independent of the state; but it did not lose its titles by becoming united with the imperial government, and becoming subject to its control or interference in its organization, principles, and practice, though this was a very substantial change. At first all its principles were independently developed, afterwards all its general councils needed an imperial call, and their decrees an imperial sanction to give them authority and validity.

The form of electing and consecrating the Pope of Rome has passed through very many and very radical changes, and yet the Roman Catholic Church did not thereby lose any of its rights of property, though the Pope is an essential element of its organization. The usage of the church shows that the form of his election and consecration is not essential. And if the union agreed upon between the Greek and Latin Churches, at the Council of Lyons, in 1274, had been consummated, the Latin Church would not have been so changed as to have lost its rights; though by that agreement the Greeks were allowed to retain many of their peculiarities.

When Norway, Sweden, Denmark, and large portions of Germany and Switzerland cast off their connection with the Pope of Rome, they introduced very great changes in their organization and principles; changes for which two centuries of earnest thought had prepared the way, and yet they retained all their churches and other institutions. In many places there were no Catholics left to enjoy or claim them.

The Scotch and English Churches were at first independent of

the Pope. Under Gregory the Great and the monk Augustine the English Church became subject to his primacy, and depended upon him for the maintenance of its organization. Under Edward III., by the statutes against *provisors* and of *præmunire*, prohibiting all ecclesiastical appointments by the Pope in England, and appeals to him, and all decrees coming from him, it became substantially independent of him, though still acknowledging his primacy. Afterwards it rejected the Pope and substituted the King as head of the church, as he practically was before; adopted the English Bible, translated and altered the Prayer-book, and adopted the Thirty-nine Articles. Most of these changes were of a very substantial character certainly, but the Scotch Church went further still.

In 1176 it became subject to the Roman Pontiff. In 1560 this primacy was rejected, and gradually episcopacy was abolished and presbyterianism substituted, and the Westminster Confession and Directory of Worship adopted. And yet in none of those instances did the developed and altered church lose its cathedrals or churches, colleges or universities.

It was on the decrees of the Council of Basle, confirmed by the Pragmatic Sanction in 1438, and by the French Parliament in 1439, that the French Church, for centuries, founded its freedom and independence, while recognising the primacy of the Pope. And yet the Court of Rome refused its sanction to those decrees. When councils fell into disuse, those differences between the demands of particular states and of the Court of Rome, in ecclesiastical matters, were usually settled and allowed by concordats, and the differences were often very wide. Where there are wide differences in the intellectual and moral development of nations, united by one ecclesiastical bond, there must be considerable differences both in the law of the church and in its actual administration.

And in all the early colleges and universities of Europe there is a similar departure from the original purposes of their creation, and of their founders. Many of them were established with the expectation that they should teach the Ptolemaic astronomy, and the Realistic or Nominalistic, or the Aristotelian or Platonic phases of scholastic philosophy; but all this has passed away, and now none of those are taught. Like churches, these are educational institutions, and their members are disciples; and the very fact of their success brings development and change, and often their trouble is that they are not themselves sufficiently developed to manage and direct the change which they have produced.

Nor can it be said that the authority, by which all those institutions passed over to the propagation of opinions contrary to the thought of the original founders, was grounded on mere might without right. All such institutions were created for the benefit

of the people, and, to meet this purpose, they must grow in form and principle with the demands that are made upon them, and no founder can be presumed, and hardly even allowed, to have intended otherwise. Moreover, in those days Church and State were one, being but two aspects of one partially or fully united government. The law of the church was not, therefore, in the church itself simply, but in the church and the state combined, that is, in the whole people. When the conscience of the whole state underwent a change, it could not decide that a corresponding change in the church, which was part of itself, was illegitimate. Having only its own conscience as a standard to judge by, it could not pronounce that wrong which was in accordance with its conscience. In the early times of New England, the organic unity and force of congregationalism was secured by the fact that the state was an essential part of the organism. The withdrawal of the state from this connection made a great change in the church; and yet the state could not pronounce that change fatal to the church's rights, because, by its withdrawal, the state had already declared that change legitimate.

We must, of course, look at this question as statesmen and jurists, and not as theologians. Whatever may be the limits that theologians may fix for the growth of the church in form or principles, we can fix none until the law can decide what particular church is perfect. All history reveals the church to us as an institution that is continually educating, developing, and changing society, and changing with the changes it produces, and this right to change is part of its freedom. No doubt many religionists think that no change can ever go so far as to justify the rejection of their peculiar customs; though to other intelligent men they may appear manifestly absurd. Such persons would expect us to prohibit all change in their practice or to declare it illegitimate. A case among the Russian dissenters may illustrate what might be thus fixed by civil law, at least until the law of nature would interfere for our relief. With them the change of the calendar, blessing with two fingers uplifted instead of three, using two instead of three syllables in uttering the name Jesus, pronouncing hallelujah three times instead of once, shaving the beard, and improving the mediæval chants and service-books by modernizing the language, were considered as damnable heresies, and as justifying separation. The state cannot visit regular and orderly changes in religion with forfeiture of rights without condemning the Reformation, and setting itself up as judge of religious controversies, which with us is always disclaimed.

No doubt the consciences of many are offended by the changes which they witness around them, and very often this is so when those changes constitute a real and valuable progress. Such changes often operate very hardly upon those who fall in the rear

[McGinnis *et al. v.* Watson *et al.*]

of the social movement; but no law can cure this, which many individuals and classes feel as an evil. The progress of the race cannot be stopped because there are many who cannot keep up with it. No man or generation of men can stop it, for nature will vanquish all obstructions and do its work.

From all this it seems very plain that we must judge these people and their acts, relative to this dispute, by the ecclesiastical laws, usages, customs, and principles which were accepted among themselves before the dispute began, and ascertain which party is right, tried by that standard. One of the most obvious of those principles is the authority of the church to legislate upon its doctrines, forms, and practice; a principle legitimately descended to them from the Church of Scotland, and maintained in full vigour by them ever since. The evidence abounds in the documents annexed to the testimony of the witnesses, and we shall only make the vigour and extent of the principle more clear by adding some facts derived from McKerrow's History of their church.

In 1557 the Church of Scotland adopted their first covenant, in 1559 a second, in 1638 another, and in 1643 the Solemn League and Covenant. After the Reformation, until 1560, they used by general consent the Book of Common Order of the Genevan Church, and then they adopted the First Book of Discipline, in 1578 the second, and in 1647 the Westminster Assembly's Directory of Worship. Until 1560 they had no confession of faith, and then they adopted the one called John Knox's, in 1581 the one called Craig's, and in 1648 that of the Westminster Assembly. This is enough to show that the church from which these parties descended had, for one of its principles, the church's authority to legislate on all matters of faith and practice falling within the sphere of its action, under the guidance, as both admit, of their understanding of the word of God.

In 1733 the secession from the Church of Scotland which gave rise to the Associate or Seceder Church, took place. Let us take a glance at their history, that we may understand the degree of vigour which this principle had among them. Their legislation appears under various forms called by them Testimonies, Acts and Testimonies, and Covenants, and even their Narratives of the Reformation Testimony contained some legislative character.

They always acknowledge the Bible as their primary rule of faith and practice, the Westminster Confession, Catechisms, Directory, and Form of Government as secondary and derivative, and their other forms of legislation as subordinate to these. And, before we trace the history of their legislation in matters of faith and practice, let us notice the degree of permanence and value which they attach to these subordinate acts, as they declare themselves in their Narrative of 1784. We may do it briefly, because a sketch of their practice will illustrate it more fully.

[McGinnis *et al.* *v.* Watson *et al.*]

Thus they speak of their Testimonies as acts "suited to the times and circumstances of our lot," and as expressing their views "of present truth and duty," and of their Covenants as bonds "suited to the circumstances of the time," as "absurd" if applied to our days, having the design to "encourage one another in promoting the reformation," and this shows clearly enough that they are, in some degree, temporary expedients, and subject to renewal and change as circumstances may seem to them to require. And they expressly declare that their Narrative shall make no part of the profession to be required of church members. And, though deriving their origin and principles from their reforming ancestors, they refuse to approve all their church action, and add: "Imperfections adhere to the best works of man; and there are many things which might be excusable, and even expedient in the peculiar circumstances of the church in that period, which would be quite improper in a more orderly, settled state of affairs," and admit that we ought to profit by the experience of past ages, and improve on it. Doubtless many of their old Testimonies would not be repeated now-a-days. Change and progress are, therefore, a recognised part of their ecclesiastical life, and this progress they usually call their "attainments." Let us trace it historically.

On their secession in 1733, they adopted their first Act and Testimony declaring their adherence to the old standards, and bearing testimony against the errors of the Church of Scotland. In 1737 they adopted a new one, somewhat modified. In the same year they admitted two ministers, Mr. Mair and Ralph Erskine, to their presbytery, though they did not accept the Act and Testimony of the church, but presented one of their own, which the presbytery pronounced equivalent. In 1741 they adopted a Testimony against a general fast kept by the church of Scotland and by some of themselves, because it had been appointed by the civil authority. In 1742 they bore testimony against the great revival in which Whitfield participated, as a delusion of Satan, and appointed a solemn fast on account of it; and adopted "an act concerning the Doctrine of Grace," which they say "is *still* to be considered as belonging to the testimony made of the faith." In their second Testimony they condemn the union of England and Scotland, which had taken place thirty years before, and the acts of toleration passed in the time of Queen Anne, and the repeal of the penal laws against witches. In 1744, they declared that the act of renewing their covenants should be a term of communion, yet very soon they suffered it to fall into disuse.

And now we come to a division among themselves. In 1746, the Synod passed an act declaring the taking of the burgess's oath inconsistent with Seceder principles, because it required the maintenance and defence of "the true religion presently professed

[McGinnis *et al. v.* Watson *et al.*]

in this realm." The next year this act was qualified so as not to be treated as a term of communion, and those who were offended at this separated themselves and constituted that branch of the church called the Anti-Burghers, and those who remained were called the Burghers. We may add that, out of this division, grew several lawsuits in the Scotch courts, and they were generally decided in favour of the majority in each congregation, because neither of the parties was recognised as a legally constituted body; a reason which is not very convincing.

Let us follow the Burghers. In 1753 they published a new Narrative, Act and Testimony, and in 1778 a Re-exhibition of the Testimony. In 1766, they approved of their missionaries in America joining the Anti-Burgher presbytery there, and in 1782 approved of them joining in the union that constituted the Associate Reformed Church there. In 1796 they bore a new testimony on the relation of the church to the state, and this gave rise to another body of seceders who called themselves Original Seceders. We do not follow their history; but it was this secession that gave rise to the case of Craigdallie *v.* Aikman, 1 Dow 1, and on its going back from the House of Lords, it was decided by the Lords of Session, in 1815, that those seceders had not "the slightest ground for the charge of abandonment of the original principles of the Seceders."

Let us go back to the Anti-Burghers, from whom the seceders in this country chiefly claim their descent. The Narrative of 1784, of the American branch of the church, leaves out all their internal dissensions of this period, and no doubt this was a very prudent concession to the fact that the presbytery here was composed of both Burghers and Anti-Burghers. But we may notice a few facts showing the extent of the legislative authority asserted by them. Of course they, the Anti-Burghers of Scotland, testified against the Burgher errors that had caused the division. In 1778 they bore testimony against the Act of Parliament repealing the penalties and disabilities imposed upon Roman Catholics, "as inconsistent with the duty of Christian and Protestant rulers, contrary to the laws of God, greatly dishonouring to the Redeemer, and a further progress in the public and national apostacy from the Reformation." In 1784 they disapproved of the Associate Reformed Union here; and in 1788 they bore testimony against slavery, which was also done by the Synod here in 1811.

In 1805 they enacted a renewal of their covenants, with new Narrative, Act and Testimony, Acknowledgment of Sins, Profession of Faith, and Engagement to Duties. In doing so they say that they do not approve of all the measures of the Reformation. "It is not to the imperfect managements of men that we declare our adherence, but to the Reformation itself." And, they add, "we are not precluded from embracing, upon due deliberation,

[McGinnis *et al. v.* Watson *et al.*]

any further light which may afterwards arise from the Word of God about any article of truth." And, as some of their number objected to these documents on account of their vagueness, novelty, opposition to and abandonment of old Covenants and Testimonies, the Synod granted leave to those to receive and act upon the old documents, provided they did not impugn the new ones, and allowed persons to be admitted to the communion on either. But the objectors were not satisfied, and therefore seceded and formed the "Constitutional Associate Presbytery," and enacted a new Testimony adapted to the circumstances. In 1837, it is said, they joined the established church.

It is important also to gather their opinions relative to unions among separate Christian communities. Almost all Christians desire and hope for this consummation, and of course can recognise no law against it, except such as depends on their own defects or that of others. The Seceders, and all bodies of kindred principles, do the same, when it can be done consistently with divine truth. Let us look at their acts.

The union of the Burghers and Anti-Burghers, and of the Reformed or Covenanters and Seceders in America, into the Associate Reformed Church, we have already noticed. There were proposals almost continually pending among them to bring about such unions. In 1741 the Presbyterians of America divided, partly on account of differences connected with the great revival in which Whitfield was so conspicuous, and in 1758 they reunited in the Joint Synod of New York and Philadelphia. In 1818 the Church of Scotland in Nova Scotia and the two branches of the Seceder Church there united and took the name of the Presbyterian Church of Nova Scotia. About the same time the Burghers and Anti-Burghers of Ireland united under the name of the Presbyterian Synod, distinguished by the name of "Seceders." What they called their "Basis of Union," consisted of the regular Presbyterian Standards and the original secession testimony, and an agreement to bear testimony in future, and to leave "the adaptation (of the symbols) to be afterwards digested, adopted, and exhibited to the world." In 1820 the Burghers and Anti-Burghers of Scotland united under the name of the United Secession Church. They also adopted a "Basis of Union," and in it they agreed to abstain from agitating the questions which occasioned the separation, reassert the Presbyterian symbols, disclaim compulsory principles in religion, allow diversity of sentiment on the subject of the civil magistrates' power about ecclesiastical affairs, reassert the justice of their original secession, and also the moral duty of public covenanting without requiring its observance as a term of communion, and leave the Formula and the Testimony to be settled by the united church.

No doubt, most men who are instrumental in the enactment of

regulations that seem to them of great social importance, have very large ideas relative to the permanence or perpetuity of their institutions; but this cannot make them perpetual. However much they may intend to bind posterity by them, they must fail if posterity does not find them adapted to its times and circumstances. Human nature respects its inherited institutions, and this is one of God's provisions to secure social order and to save us from anarchy. But such an inheritance is never received without some modification, whether it be made unconsciously or by design. And since intentions can never be equivalent to facts, and are so proverbially fallible and insecure; surely the intentions and hopes of one generation are not to be taken for the actual facts, usages, and customs of several succeeding ones. Though these intentions of perpetuity do often appear, yet they do not constitute the actual law that rules through successive generations.

No doubt many have had such an idea of the perpetuity of the church Formula of admission to the ministry and to membership, and that all are bound to accept its terms without any qualification or forbearance. But this would seem to be treating them as more than divine, for even the divine, in its connection with humanity, is a continual growing, and the Saviour himself " grew and waxed strong in spirit," and " increased in wisdom and stature and in favour with God and man." Their Formulas have never been treated as perpetual and unalterable; and very often, at some of the stages in the progress of the church, when a change has become developed into form, the necessity of forbearance, as between the old and the new, has been recognised. We have already given some instances of this. We find it always when unions have been formed, and we need not look to church history for this; for, according to universal principles of human nature, it is a necessary element of all unitive action.

No doubt they adopted a Formula when they constituted their first Presbytery. When they admitted Ralph Erskine and Mr. Mair, they allowed a *substantial* conformity. About 1738 the Formula was changed. On the Burgher schism there was a new one, another in 1796, another in 1804, by the church in Scotland. The church here had also one of its own adoption. On such occasions it appears to have been common to feel and express the duty of forbearance. One of the Seceder Synods reserved it for themselves in 1839, when they united with the Church of Scotland. It was granted and advised by the Synod in 1782, to the great discontent of some, when the dispute arose about the necessity of lifting the sacramental elements before the consecrating prayer, and no doubt it has been done on very many occasions, when men of undue earnestness, partisanship, or selfishness, or of uncommon perspicacity, regarded it as involving great laxity or sacrifice of principle.

[*McGinnis et al. v. Watson et al.*]

After this historical survey of the principles and usages of the Seceder Church, it becomes very easy to dispose of all the special objections to this act of union. It is objected that, by the Basis of Union, the Confession of Faith is altered on the subject of the relation of the church to the state, and of the duties of the civil magistrate. But these articles were originally adopted by the General Assembly of the Church of Scotland under a similar interpretation, and were so interpreted by the Presbyterian Church here in their adopting act of 1729, and the Seceders have always claimed and exercised the right of interpreting them in their own way. We do not discover here any sacrifice of principles.

Again, it is objected that the union is an abandonment of the Testimony of 1784 against the Associate Reformed Church, and this without any retraction on their part. Certainly it is; but that testimony was neither in its nature nor in its intention perpetual. The body that enacted, might repeal it. But the objection takes a very special form. Because, more than a century ago, the Covenanters or Reformed had denounced the Seceders " as teachers of false doctrine, as treacherous in covenant, as enemies to the Lord's work, as barefacedly belying the Scriptures, as guilty of a most dreadful and deceitful imposition on the generation;" and because, eighty years ago, the Covenanters had united with Seceders in forming the Associate Reformed Church; therefore the Associate Reformed Church must repent of this sin of the Covenanters, not before God, but before man. This is a very remarkable visitation of the sins of the fathers upon the children unto the third and fourth generation, not by God, however, but by man; and displays a mind remarkably receptive and tenacious of offence, and demanding redress far beyond the time allowed by any statute of limitations known to us. It ought not to be expected that we should sympathize with such high-strung censoriousness and party spirit and vindictiveness on either side. We must be more reasonable, and allow people to settle old disputes simply by shaking hands, if they please, and saying nothing about old scores. Even without seeing how to account for old causes of difference, they may discover enough that is good and honourable in each other's principles to justify them in meeting again and working together for the common good. There would have been more reason in the objection that the Basis of Union abandons the Testimony of 1827 against the Union of the Burghers and Anti-Burghers; but here again the answer is, they had as good a right to abandon as to enact it. By this and several other objections, the plaintiffs put themselves substantially on the ground occupied by Mr. Nairn, who seceded in 1743 and helped to organize the Covenanter Church.

The name Seceder is abandoned. Yes, it is; but that is a

natural incident of the Union, and must go with its principal. Moreover, that is not the name which they adopted—it was imposed upon them by the public. It is surely to be regretted that the acts of the church should be offensive to its members; but it is much more to be regretted that any members should be so wedded to a name or other form as to be offended at what the church regards as a progress that increases the organic force of its principles. The Episcopal Church of the United States lost none of its rights at our Revolution by giving up its old name of the Church of England in America; and all its churches, including Trinity, New York, retained their property under the new organization and the new name, though the old was very dear to many of its members. All growth and progress makes some disturbance, and some change of relations, and requires some rearrangement of systems. This is the natural course of all things known to men, and no man has authority to condemn it. If he is competent, he may guide the growth, and *thus* control its consequences.

There are other objections; that, in the Basis of Union, there is an abandonment of Seceder strictness in relation to communion, psalmody, secret societies, and the duty of covenanting and bearing testimony, and generally of the rigidity of secederism. These we may consider together.

The historical sketch that we have given shows that in none of these matters has the Synod transcended its usual authority. All these objections proceed on the assumption of a want of due strictness. And here we adopt the language of Lord Stowell in the case of The Procurator-General *v.* Stone, 1 Haggard's Cons. Rep. 424, on a charge against a minister for affirming doctrines contrary to the Thirty-nine Articles. "It is not the duty or inclination of this court to be minute and rigid in applying proceedings of this nature; and if any article is really a subject of dubious interpretation, it would be highly improper that this court should fix on one meaning, and prosecute all those who hold a contrary opinion regarding its interpretation."

And we adopt also the language of the Judicial Committee of the Privy Council in Gorham's Case, where it was decided that the Bishop of Exeter was wrong in refusing institution to a minister, because of his holding that spiritual regeneration is not conferred in baptism. They say: "Upright and conscientious men cannot in all respects agree on subjects so difficult (as many theological questions). This court has no authority to decide what ought to be the doctrine. We do not affirm, that the doctrines of Jewell, Hooker, &c., can be received as evidence of the doctrines of the church; but their conduct, unblamed and unquestioned as it was, proves, at least, the liberty which has been allowed of maintaining such doctrines."

[McGinnis *et al. v.* Watson *et al.*]

All these objections proceed upon the assumption of a degree of strictness and rigidity which the law cannot appreciate. *Apices juris non sunt jura.* Our ideals of strictness are never the actual law of any society, except in times of excitement on the subject to which they relate. Extremes never represent the true living law of any people, though they may represent that towards which it is growing, or, that which it has outgrown. It is a plain law of nature that time and peace wear off the acerbities and extreme points that grow up in all social divisions, and we are not authorized to counteract this result. Union among churches is a perfectly legitimate part of their purpose and of their freedom, and mutual concession is part of the natural law of it, which we cannot direct or limit.

We need not inquire how far the Basis of Union relaxes the former strictness on the subject of communion, psalmody, covenanting, and bearing testimony; for, if the objections are true in fact, there may have been good reasons for doing so, and of this the presbyteries and synods were their constitutional judges. They may have judged that the strictness which was generated in times of great intellectual collisions, was not the normal condition of affairs; that the requisition of an intelligent acceptance of the Confession of Faith, Catechisms, Covenants, Narrative, and Testimony, as a condition of membership, might seem like requiring people to be thorough theologians before being received as disciples; that, in logical phrase, the more comprehensive is their system of principles, the less extensive it must be; the more doctrines it makes essential, the fewer people can accept it; the more exacting the bond, the fewer will come under it; and that, though an intelligent joining in bearing testimony against the errors and sins of those around them and of past generations, may secure a very considerable acquaintance with the history of doctrines and of church controversy, yet it may be carried to such an extreme as to beget a very large amount of pride and censoriousness, and substitute a mere legalism for religious principles. However this may be, they have adopted a testimony on all these subjects, which they have deemed sufficient, and we find in it no such departure from ancient usages as entitles us to condemn their decision. We cannot condemn such proceedings as unlawful without deciding that there can be no unions of the church without a forfeiture of civil rights, and that the law almost compels the perpetuation of divisions.

Many judicial decisions very properly make such questions as those turn upon the fact of identity; but, as this term itself stands in need of explanation, we have not hitherto made much use of it. The foregoing discussion, however, prepares us now for a reasonably precise understanding of it, with the assistance of a very few additional suggestions. The analogies of identity of mere dead

[McGinnis *et al. v.* Watson *et al.*]

matter would not help us much, for it is living identity we are dealing with. A few of these may aid us.

That acorn : follow the idea of identity in it. Future generations may point to that old oak some centuries old, with many of its branches gone, and decay commenced, and say : there it is. That helpless infant : the next generation may point to a Newton or a Washington, with his mature growth, and his immense accretions of intellectual power, and moral majesty, and social influence, and say : there he is.

But it is rather identity of social life that we want to understand. All social life involves a common participation in spiritual acquisitions, a mutual giving and receiving of moral and mental influences according to the capacities and opportunities of each individual, and a social and individual growth thereby. All institutions, to be social at all, must be adapted to this giving and receiving of influence, and must share in the social growth ; educational institutions that have not this adaptation must die by their own success. And yet they must have organic form that will give them force and save them from being merged in the common mass. To be social institutions without this adaptation, and participation, and growth, is a contradiction in terms, as much, though not so obvious, as to say that the radii of a circle are unequal.

It is essential, therefore, to social institutions that they grow with society, and in adaptation to its intelligence and wants, and times and circumstances, and in so far as they fail in this, they detract from their *social* identity and social life, and begin to decay. Of course, for *such* departure we can have no measure, and therefore no definite law; but the natural law is not hard to discover. Thousands of institutions have died out because of this want of reciprocity with a growing society. Thousands of governments have failed and disappeared for the same reason. Too often they represent mere social *form*, while all the social *life* is in the people alone. All organizations, political or social, that consult only their own wills, and that oppress or condemn society because it will not accept what they decree to be benefits, and in the form in which they choose to confer them, must necessarily be rejected by society when it can obtain substitutes.

Yet the people remain and preserve their social identity in all these changes of government. We cannot deny the identity of the Transalpine Gauls with the modern French, because of the many subjugations, and revolutions, and changes of government and religion which they have undergone in the last twenty centuries : nor that of the Anglo-Saxons with the English, because of similar changes. All such changes are but the accidents of the social life, the continuity of which constitutes its identity.

It will readily be seen that we are not here announcing any positive law of civil society, but simply endeavouring, it may be unsuccessfully, to illustrate a fundamental principle of social law.

[McGinnis *et al. v.* Watson *et al.*]

Philosophy and history may trace out these social principles in long periods; but such a task is beyond the demands of legal administration, its duty being best fulfilled by keeping itself in harmony with the common order of society for the time being. It *must* regard the forms and accidental principles of social organisms much more than history and philosophy do, because they are of great importance in the short periods to which legal actions refer, and because history and philosophy investigate, while the law regulates, the course of events. *They* may recognise social identity wherever they can trace a continued social unity, however great may be the variety and changes of its forms and principles. Law deals with short periods in its administration, and with individuals and societies *under government,* and expects to find social unity continued without any violent rupture of forms or departures from principles, and yet makes all reasonable allowances for development according to principles, and with due respect for customary forms. Let these thoughts pass for what they are worth in themselves. If they do not illustrate the subject, they are good for nothing here.

Doubtless there may be cases wherein the change complained of as a violation of social identity is conducted according to all the forms of order that are recognised in a given society, and yet it may be of such a character, or be produced by such unfair means, or by such partisan agitations, as not to be entitled to the support of the law in its equitable administration of justice. Or the general organism may so fall into anarchy that the subordinate organisms can have no peace or prosperity under its rule, and then a separation may be justified in equity. It may allow secession in such cases, because it has no adequate remedy; while in mere civil relations it cannot admit its own inability. But we forbear to give any special opinion on supposed cases of this kind. In this case there is nothing of the sort. We can hardly imagine a case that could have been more patiently, deliberately, charitably, and thoroughly considered, and it was almost unanimously decided.

We might have decided this case by saying, that there is nothing in the plaintiff's evidence that shows that the action complained of, judged by the constitution and usages of the Seceder Church, was brought about by any excess of authority on the part of the presbyteries and synod. But we have preferred to treat the case as if the burden of proof was on the defendants, and show affirmatively that the proceeding is in harmony with the authority usually admitted to belong to those bodies.

Among the cases that sustain the foregoing views is that of The Attorney-General *v.* Gould, 2 Law Reporter (London) 495, where the church lot was purchased by and "for the use of the congregation of Particular Baptists," &c., which congregation then practised close communion, though in association with other Baptist

[McGinnis *et al. v.* Watson *et al.*]

churches that allowed free communion. After many years, a majority agreed to allow free communion in this church also, and on a suit by the minority to prevent it, the Master of the Rolls, Sir John Romilly, decided that the majority of an independent congregation had power to make such a change of its usages, and that there was nothing in the form of the deed to prevent it.

But one of the very ablest judicial opinions that we find in our books on this subject is that of Chief Justice Marshall, of Kentucky, in Gibson *v.* Armstrong, 7 B. Monroe 481, wherein it is decided that in general organizations of united churches, the law of the general organism is binding on all the individual churches, and that even a majority seceding, lose all their rights in the church property. And this view we find ably supported by several other decisions: Harper *v.* Straws, 14 B. Monroe 48; Den *v.* Pilling, 4 Zabriskie 653; The John's Island Church Case, 2 Richardson's Eq. R. 215. A contrary rule would encourage partisan strifes in congregations and in general church organisms, for the purpose of unjustly getting possession of church property, and would endanger the peace and effective social force of all church unions: a position which the state and its law ought not to occupy. We think the defendants, now incorporated, are entitled to the property.

> Decree of the Common Pleas is reversed, and the bill of the plaintiffs is dismissed at their costs.