## Cosfol v. Varvoutis

*Dennis, Lichtenstein, Cohen & Dennis,* for except-ants.

*Abrahams & Loewenstein,* contra.

SLOANE, P. J., January 16, 1964.—Plaintiffs have brought this equity action in a dispute between two factions of the Greek Orthodox Catholic Community of Philadelphia, over church property.

Defendants moved the parish formerly situated at 745 South Twelfth Street, Philadelphia ("Evangelismos") to Elkins Park, just north of Philadelphia. Defendants further plan to sell the Twelfth Street property. Both these actions are pursuant to votes of the community and approval of the church hierarchy. Plaintiffs, in a class suit, allege violations of the bylaws and charter as the basis of their claim that defendants have acted improperly.[1]

Chancellors in equity approach church disputes with a delicate hand. The sentiments and sensibilities which unite people in faith and religious worship are best vindicated, when disputes arise, with ecclesiastical authority. The constitutional right to the free exercise of religion is a great bulwark, but when intertwined with property disputes, a court of equity must characterize the case as involving primarily a threat to freedom of religious worship or rights in religious property.

This case is clearly of the latter type; no one has denied, or is seeking to deny, plaintiffs their right to worship as they please. But the property on which plaintiffs have worshipped for many years is about to be sold, and church assets have been used to buy new

---

[1] The pleadings do not accurately reflect the position of the parties. The three plaintiffs are members of the Philadelphia Greek Orthodox Community. The community is the relevant membership group, organized as a nonprofit corporation and holding title to both community parishes, Evangelismos at 745 South Twelfth Street, and St. Demetrios, at Fifty-ninth and Larchwood Streets, both in Philadelphia.

Defendants were trustees of the Philadelphia Community at the time of the filing of the suit; they were not all trustees when this dispute arose.

property. Community members in sympathy with plaintiffs find Twelfth Street more convenient than Elkins Park; they are free to go to Elkins Park with defendants, but do not wish to do so. The issues are simple: Was it proper to buy and move to Elkins Park; is it proper to sell Twelfth Street?

The legislature has seen fit to deal with this problem and has, as is its discretion, directed that courts of equity, when confronted with a dispute involving church property, are to look to the rules of the association, and if the church property has been administered according to those rules, and according to the purposes for which the property was dedicated, then the property is being administered properly: Act of April 26, 1855, P. L. 328, as amended, particularly by the Act of June 20, 1935, P. L. 353, 10 PS §§81, 81a.

Beyond this, the clear import of the legislature's mandate is that dissident members of the church must look to their congregation and ecclesiastical authorities for relief.

The task of the chancellor is thus set out: He is to look at the purposes of the church, as expressed in canons, regulations and the charter and see if there has been a diversion. Then he must look at the rules and regulations of the church and see if the officers have followed these. If there has been no diversion of property and no variance from the regulations, then the chancellor is powerless to interfere with the actions of the association.

That is this case in brief. I could find no diversion of property from the canons of the Greek Orthodox Catholic religions or from the principles of the Philadelphia community or Evangelismos parish, as it was founded. Likewise, I could find no variance of any substance from the bylaws of the church that would justify setting aside the community actions in dispute here. For these reasons, I dismissed the complaint.

Plaintiffs filed exceptions to the dismissal which were heard en banc and dismissed in whole. This opinion sets out more fully the reasons that prompted dismissal of plaintiffs' complaint.

Plaintiffs are aggrieved; they lose their neighborhood parish; but this is an unfortunate concomitant of the mobility of people and neighborhoods. People move, and so do their churches. Plaintiffs are entitled to sympathy, but, on the evidence they presented, I had no authority to grant relief.

The focal points for analyzing adherence to the regulations of the parish are two meetings held by the community membership. The first, held October 23, 1960, concerned the purchase of the Elkins Park property and the transfer thereto of Evangelismos. The second, held October 8, 1961, concerned the sale of the Twelfth Street property. Plaintiffs alleged irregularities in the proposals, announcements and conduct of these meetings.

October 23, 1960: This general assembly meeting, held in the St. Demetrios Parish, Fifty-ninth and Larchwood Streets, was called by the board of trustees at a meeting on October 2, 1960. Notice, dated October 7, 1960, in Greek and English was sent by ordinary mail, as the bylaws in effect at that time required: See appendix, paragraph 1. The meeting was described as the "2nd Regular General Assembly", although it was the fourth meeting of that year, two previous meetings being characterized differently: See appendix, paragraph 2.

There was dispute as to how many persons actually were members of the Greek Orthodox Community. Plaintiffs contend there are 570 members; defendants say 400. It appears that 71 eligible voters were present at the start of this meeting, and their names were called off by the secretary: See appendix, paragraph 3.

There was discussion of the proposed purchase of an

Elkins Park property, the cost of acquisition and remodeling, and an estimate of new families that would then join because of a more convenient location. Several members stated their opposition to any transfer. The motion to purchase the Elkins Park property and transfer Evangelismos parish was passed by 52 votes in favor, 15 against, with four abstaining. This margin was over the two-thirds required by the bylaws for the purchase of real property: See appendix, paragraph 4.

Following this meeting, there was no protest made through ecclesiastical channels by plaintiffs or anyone on their behalf. And it is important to note that on December 7, 1960, Archbishop Lakovos, the highest ecclesiastical authority in North and South America, and the Mixed Council of the Greek Archdiocese of North and South America, the executive council with administrative jurisdiction in secular matters, notified the Philadelphia community that the resolution for the purchase of the Elkins Park property was approved and authority granted to proceed with the purchase.

October 8, 1961: There is no record of this meeting being proposed by the board of trustees. However, there was no proof that the proposal was other than proper. Under the bylaws now in effect (1961 edition), notices for meetings which will consider sales or purchases of real property must be sent to the members of the parish by certified mail: See appendix, paragraph 5. Some of the witnesses thought they had received the notice by regular mail; but the weight of credible testimony, reinforced by numerous certified mail envelopes introduced into evidence, indicates clearly that the notice was sent by certified mail.

The notice of this meeting, sent to the community, clearly indicated that the sale of the old Evangelismos building was on the agenda. The meeting was held at Evangelismos, so that the persons most affected by the

proposed sale would not be inconvenienced. Seventy members eligible to vote were present at this meeting. Plaintiffs contend that two of these persons were not eligible to vote, that two other members were refused the opportunity to bring their dues up to date, as was their right (see appendix, paragraph 6) and thus refused a ballot, as allegedly was their right.

After a roll call of the members, the resolution to sell the Evangelismos building passed by a vote of 48 in favor, 22 against. Thus, plaintiffs might have succeeded in preventing a two-thirds majority if the two members challenged had not voted and the two members refused had voted.

But even aside from mathematical niceties, plaintiffs contend that one invalid vote invalidates an entire voting. This would seem to be true for an election of directors (trustees) but not other votes. (See appendix, paragraph 7).

There was no objection to any of the names of eligible voters read at this meeting. There was no objection made at the meeting of an eligible voter being denied the right to vote. At trial, plaintiffs produced testimony of alleged irregularities. Two members of the community, Steve Lefkadatis and Theodore J. Kangas, testified that they were not allowed to bring their dues up to date at the meeting. There is no specific contradiction of this testimony about the tender of dues, although some witnesses said they knew of no one who had voted improperly or had improperly been refused a vote.

George Zantopoulos, a witness for defendants, testified on cross-examination about the procedure:

"The names . . . as you walked into the meeting you were checked out, you were looked up in the church records, to see if you were paid. If you were in good standing with the church, you signed the ledger. That ledger, when the time came for the vote, was picked

up and taken to the front table, to the president. He read the names off and handed a ballot to every name that was on this ledger. . . . Nobody was barred at the door. Everybody was allowed to come into the place. Your name would appear on the ledger only if you were a member in good standing of the Greek Orthodox Community of Philadelphia."

Plaintiffs have failed to prove that the denial of ballots was arbitrary or capricious. But most importantly, no objection was made when an objection should have been made, *at the meeting*. Controversy over voting procedures should start when the vote is being taken, not months later when the events have passed from peoples' minds and the matters that were voted upon have been executed.

Again, it is important to note that on December 15, 1961, Bishop Germanos, of Nyssa, the Vicar of the Greek Orthodox Archdiocese of North and South America, addressed a letter to the Philadelphia community, indicating that the October 8, 1961, resolution, authorizing the sale of the Twelfth Street church, was approved by the Executive Committee of the Mixed Council.

On March 17, 1962, Archbishop Lakavos officiated at a vesper service at the Evangelismos church. The purpose of this service was to mark the end of that property for use as a religious edifice. At the conclusion of this service, petitions protesting the sale of Evangelismos were presented to the archbishop, but no appeal or protest of any kind had been made to an ecclesiastical authority prior to this time. Archbishop Lakavos indicated he would look into the matter and conferences were held, but no agreement was reached satisfactory to plaintiffs. Thus, this suit.

Following this March 1962 meeting, parish members in sympathy with plaintiffs have attempted to maintain a vigil in the Evangelismos building by hav-

ing one person on the premises at all times. This vigil was interrupted by defendants, or persons acting with defendants, entering the Evangelismos church one evening and removing religious articles therefrom.

Plaintiffs contend that Evangelismos, as the first Greek Orthodox Church in Philadelphia, is a shrine. They oppose its sale on those grounds. Plaintiffs further contend that St. George's Church, nearby and of the same faith, follows somewhat different customs of worship, important differences to them. We sympathize with plaintiffs, and with plaintiffs' sympathizers, but ask them to realize that issues such as these are addressed to religious authorities, not to civil courts.

Article III of the congregation's charter, states:

"The place where said corporation is located and where its business is transacted is the City of Philadelphia, in the State of Pennsylvania."

Plaintiffs are contending that since the new building is in Elkins Park, about a mile north of the Philadelphia city line, there is a charter violation. This is incorrect, because the charter is for the community as a whole, and St. Demetrios parish remains situated in Philadelphia, although it also might move. But I do not regard removal of the church edifice shortly out of city limits a charter violation of any substance.

Plaintiffs introduced evidence, unrebutted by defendants, that no list of members was posted, as the bylaws require: See appendix, paragraph 8. Further, the minutes were signed, but not by the president, secretary and priest, as required by the 1959 edition of the bylaws: See appendix, paragraph 9. These procedural defects are not so serious or so glaring as to void an otherwise duly conducted meeting, which had the full approval of high church authorities. There is no allegation that the minutes are wrong or totally unsigned or poorly kept, only that they are not signed by three persons. There is no allegation that the member-

ship list was purposely concealed or otherwise inaccessible, only that it was not posted.

A second count to plaintiffs' complaint in equity alleged mismanagement. The evidence introduced was scanty, mostly unexplained checks or bills. Defendants explained them well; I could not find that church moneys were not expended properly.

I should also consider any Federal constitutional protection, as a possible bar to State court action.

"Separation means separation, not something less. Jefferson's metaphor in describing the relation between Church and State speaks of a 'wall of separation', not of a fine line easily overstepped."

These words of Justice Frankfurter, concurring in Illinois ex rel. McCollum v. Board of Education, 333 U. S. 203, 231 (1948), apply not only to religious instruction in public school (school buses for parochial schools: Everson v. Board of Education of the Township of Ewing, 330 U. S. 1 (1947) ); (prayers or bible reading in public schools: Engel v. Vitale, 370 U. S. 421 (1962), School District of Abington Township v. Schempp, 374 U. S. 203 (1963) ), but also to the problem at hand.

Aside from the Pennsylvania act of 1935, and insofar as the actions of a civil court are to be construed as State action: Shelley v. Kramer, 334 U. S. 1 (1948), National Association for the Advancement of Colored People v. Alabama, 357 U. S. 449 (1958), for this court to interfere in the religious affairs of an independent church would be a clear breach of that wall of separation. This is especially true since plaintiffs can show no infringement of a right protected by the first or fourteenth amendments of the United States Constitution or by the Pennsylvania Constitution.[2]

---

[2] Pennsylvania Constitution article I, sec. 3: "All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; . . . and no preference

There is a long history of church property disputes in courts. See note, Judicial Intervention in Disputes over the use of Church Property, 75 Harv. L. Rev. 1142 (1962). The leading American case is Watson v. Jones, 80 U. S. 679 (13 Wall.), decided by the U.S. Supreme Court in 1871. Two factions of a Louisville Kentucky Presbyterian Church were contesting over control of the church property. The administrative body (General Assembly) of the Presbyterian Church had ruled in favor of the majority faction, but its decision was overturned by the Kentucky Court of Appeals. The majority group, claiming diversity jurisdiction, took their case to the federal courts, which granted them relief, upholding the General Assembly, and the Supreme Court, per Justice Miller, affirmed.[3]

Three different types of religious associations were distinguished; the third, a religious body which is a subordinate of a general church organization with superior ecclesiastical tribunals, was the subject of Watson v. Jones, supra, and is the subject of the present case. Distinguishing the English rule, which allows the chancellor to closely investigate the actions of even a hierarchical church,[4] Justice Miller noted the com-

---

shall ever be given by law to any religious establishments or modes of worship."

United States Constitution, Amendment I: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; . .": Cantwell v. Connecticut, 310 U. S. 296 (1940), held this amendment enforceable on the States through the fourteenth amendment.

[3] Any res judicata problem was avoided by the Supreme Court by characterizing the case before them as one of schism in church, and the prior case in State courts as one of election of elders. See 80 U. S. 717 (13 Wall.)

[4] The leading case is Attorney General v. Pearson, 3 Mer. 353, 36 Eng. Rep. 135 (ch. 1817). This case has been cited for the "implied trust" doctrine, that once a church has been dedicated to a certain doctrine, then, in the words of Lord Eldon, "I do not appre-

pletely independent status of religious associations in the United States. Watson v. Jones, supra, held that, with hierarchical churches,

"[W]henever the questions of discipline or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them": 80 U. S. 727 (13 Wall.)

This broad rationale has been extended by the Pennsylvania Act of June 20, 1935, P. L. 353, 10 PS §§81 and 81(a), to decisions concerning church property made by church authorities, so long as these decisions are the result of adherence to the organization by-laws.[5]

Thus, the Act of 1935 builds a "protective wall", a shield, around the religious association, so that it may conduct its affairs free of State interference. In Pennsylvania, churches not only have the Federal and State constitutional guarantees of freedom, they also have State statutory protection.

---

hend that it is in the power of individuals, having the management of that institution, at any time to alter the purposes for which it was founded . . .": 3 Mer. 400, 36 Eng. Rep., at 150.

[5] This act of 1935 changed the import of the earlier Act of April 26, 1855, P. L. 328, which had vested control in the laymen of the congregation: Canovaro v. Brothers of the Order of Hermits of St. Augustine, 326 Pa. 76, 88 (1937). This statute also incorporates Lord Eldon's ideas, by forbidding diversion of property from the purpose for which it was originally dedicated, Church of God v. Church of God, 355 Pa. 478 (1947).

Cf. McGinnis v. Watson, 41 Pa. 9 (1862), with Schnorr's Appeal, 67 Pa. 138 (1870), for Pennsylvania's common-law experience in adopting Lord Eldon's views.

This approach has been criticized as unduly limiting the ecumenical movement of modern religions by forbidding changes in doctrine and dogma: Casa, The Establishment Clause and the Ecumenical Movement, 62 Mich. L. Rev. 419 (1964).

A State law, as Kedroff v. Saint Nicholas Cathedral of the Russian Orthodox Church in North America, 344 U. S. 94 (1952), shows, can also be characterized as a sword destroying the "free exercise" of religion. There, the New York Legislature established an American faction of the Russian Orthodox Church in control over church property in New York City, thus removing from power the church's central governing hierarchy in Moscow. The Supreme Court, in a broad reaffirmation of Watson v. Jones: 80 U. S. 679 (1871) (13 Wall.), struck down the statute as State interference with the federally protected free exercise of religion. In Watson v. Jones, the court, per Justice Reed, said:

"radiates . . . a spirit of freedom for religious organizations, an independence from secular control or manipulation — in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine. Freedom to select the clergy, where no improper methods of choice are proven, we think, must now be said to have federal constitutional protection as a part of the free exercise of religion against state interference": 344 U. S. 116.

Thus, Watson v. Jones, a diversity case applying common-law principles, assumes new status when supported with such broad language in a case squarely presenting first amendment problems and applying first amendment principles.

It becomes clear, that once making a factual decision that there had been no substantial variance from Greek Orthodox bylaws by the Philadelphia community, for a chancellor to afford plaintiffs the relief asked for in their complaint would be a forbidden intrusion by a State court on the right of a hierarchical church's administration of religious property, an as-

pect of the constitutional right for the free exercise of religion.

However, even if I had found substantial variances from Greek Orthodox bylaws, the Kedroff opinion signals a warning that any interference by the State with hierarchical churches over the administration of their parishes, including the property of their parish churches, might be an unconstitutional interference. Kedroff, supra, is a harbinger for the holding that in property matters, the hierarchy's decision is binding on civil courts:

"Ours is a government which by the 'law of its being' allows no statute, state or national, that prohibits the free exercise of religion. There are occasions when civil courts must draw lines between the responsibilities of church and state for the disposition or use of property. Even in those cases when the property right follows as an incident from decisions of the church custom or law on ecclesiastical issues, the church rule controls. This under our Constitution necessarily follows in order that there may be free exercise of religion"[6]: 344 U. S. 120-21.

This intimates that plaintiffs in this case had no remedy here once they failed to seek relief within the church, or did so too late, and were refused.

Canovaro v. Brothers of the Order of Hermits of St. Augustine, 326 Pa. 76 (1937), with its companion case, Post v. Dougherty, 326 Pa. 97 (1937), is a leading case on the church-property issue as well as a precedent for the facts before me.

---

[6] Cf. Kreshik v. Saint Nicholas Cathedral of the Russian Orthodox Church of North America, 363 U. S. 190 (1960), (per curiam) again reversing the New York Court of Appeals which had reached the same result as it did in Kedroff, only on common law grounds. Kreshik actually elevates Watson v. Jones a bit higher than Kedroff, since it ostensibly, though sub silentio, rules that a State cannot have even its own common law on the matter of church property, at least to any extent that it interferes with hierarchical control.

A Roman Catholic parish and seat of a St. Augustine order was ordered dismembered by the archbishop and ordinary, who happened to be the same person. Plaintiffs sought relief through the church hierarchy, claiming that the parish property was impressed with a trust to be used as an Italian church and school. Failing there, plaintiffs started a suit in equity which was dismissed by the trial court, on the ground that plaintiffs had no standing to sue since they were no longer members of the parish, it having been dismembered. The dismissal was affirmed, in a broad opinion considering many aspects of church-property affairs in civil courts.

The essence of that opinion, like its Federal precedent, Watson v. Jones, supra, is that civil courts have little power to interfere with the decisions of a church hierarchy. "Division, dismemberment or suppression of parishes, and the effect thereof on membership are purely ecclesiastical matters, dependent upon the church law as administered by the appropriate authorities and tribunals": 326 Pa., at page 84. The court further reviewed the Acts of 1855, P. L. 328, and 1935, P. L. 353, 10 PS §§81 and 81(a), concluding that "Property control, as well as other ecclesiatical matters, is now governed by church law, since the impediment imposed thereto by the civil law [act of 1855 vesting control in lay members] has been removed": 326 Pa., at page 88.

And as to the contention that dismembering the parish was a taking without due process, it was held that even under the Act of 1855, supra, the lay members had control only as trustees, and without any vested interest that would preclude future legislation from regulating the control of the property: "The interest created by the Act of 1855 does not possess the character of a vested right within the Constitution": 326 Pa. at page 94.[7] And that is just as true in the

present case. The Evangelismos parish was founded in 1907, when the Act of 1855 was in full force and effect. And even though the present plaintiffs are still members of the Philadelphia Greek Orthodox Community, they have, as lay members, no vested rights under the Act of 1855 that they can contend were taken away by the Act of 1935, or by the actions of the Philadelphia community in selling the Twelfth Street property.

In St. Peter's Roman Catholic Parish v. Urban Redevelopment Authority of Pittsburgh, 394 Pa. 194 (1958), appeal dismissed and cert. den., 359 U. S. 435 (1959), the action of the lower court in sustaining preliminary objections to plaintiffs' equity complaint was upheld.[8] The suit was brought by parishioners whose Roman Catholic church in Pittsburgh had been condemned by defendant authority. Subsequently, the condemnation was withdrawn and the authority entered into an agreement with the Bishop of the Diocese

---

[7] Cf. McKean Estate, 366 Pa. 192, 195 (1951): "While in some circumstances an Act of Assembly may be applied retrospectively where such intent is plain, such a result, however, is never permitted where vested interests are destroyed or affected . . ." See note, Current Problems in Pennsylvania Law, 99 U. Pa. L. Rev. 814, 864-67 (1951).

An early Pennsylvania act, prerevolutionary, directed, with language of retroactivity, that property given to religious societies shall be for the sole use of the societies, if they had been in "peaceable possession" for 21 years: Act of February 6, 1731, 1 Sm. L. 192, sec. 2.

[8] Plaintiffs did not rest. They filed a de novo complaint in the United States District Court for the Western District of Pennsylvania, which dismissed the complaint on the ground that the Pennsylvania Supreme Court decision was res judicata. A direct appeal to the United States Supreme Court was dismissed, sub. nom. Cerminaro v. Urban Redevelopment Authority of Pittsburgh, 362 U. S. 457 (1960). Plaintiffs then succeeded in getting a preliminary injunction in the Pittsburgh Common Pleas Court against the authority, but this decree was reversed as an abuse of discretion, 401 Pa. 182 (1960), Bell and Musmanno, JJ., dissenting.

of Pittsburgh who accepted damages in a compromise settlement for the taking and destruction of the church.

Mr. Justice Bok, for the court, discussed the Act of 1935, supra, and the fact that title to and power to dispose of church property was, according to Roman Catholic canons and rules, in the bishop, and that plaintiffs, as parishioners, had no property rights that they could contend were being denied. Of Canovaro and Post v. Dougherty, supra, it was said:

". . . the Roman Catholic canons and the decisions of the appropriate tribunals and officials of the Church control the issues raised in the case, unless those canons and decisions should contravene the law of the land. Both cases involved extinction of a parish by proceedings in accordance with church regulations. *If a parish can be extinguished, a church building can be razed*": 394 Pa., at page 198. (Italics supplied.)

In the Greek Orthodox Catholic religion, the canons and bylaws control the issues raised in this case. Control over property is vested in a two-thirds majority of the parish, subject to the approval of the Archdiocesan Council. The parish has voted and the council has approved. Plaintiffs have no remedy here.

Finally, I found in the adjudication that plaintiffs are guilty of laches in their claims respecting the acquisition and remodeling of the Elkins Park property.

Plaintiffs made no protest to the relevant church authorities until almost a year and a half after the resolution for the purchase of the Elkins Park property was passed. Furthermore, payment of the full purchase price of the Elkins Park property was made and expensive alterations were begun. This presents a classic situation of laches as a defense to an equity suit. "Laches arises when a defendant's position or rights are so prejudiced by length of time and inexcusable delay, plus attendant facts and circumstances, that it would be an injustice to permit presently the

assertion of a claim against him": Commonwealth ex rel. Storb v. Schroll, 398 Pa. 354, 357-58 (1960) ; Stahl v. First Pennsylvania Banking and Trust Company, 411 Pa. 121, 129 (1963).

With the attendant circumstances of this case, cost of acquisition, and remodeling, plaintiffs cannot now complain of defendants' action because there was not timely protest. The adjudication did not find that plaintiffs were guilty of laches in their claims regarding the Twelfth Street property. In this instance, their protest, to the archbishop, came about six months after the sale had been voted upon by the Philadelphia community, but the sale had not yet been consummated. This might have been delay, and this suit may have prejudiced defendants on that score even though they have not yet sold the property: "[L]aches will not be imputed to a plaintiff where no injury results to the defendant by reason of the delay": Guarina v. Bogart, 407 Pa. 307, 315 (1962).

But regardless of any defense of laches which defendants might have relating to the sale of Twelfth Street, as opposed to the purchase and remodeling of Elkins Park, plaintiffs still have no valid claim to force the rescission of the resolution approving the sale of Twelfth Street and the subsequent approval by the church hierarchy.

APPENDIX

*Excerpts from Regulations and Uniform*
*Parish Bylaws of the Greek Archdiocese*
*of North and South America*
1. The bylaws in effect at that time (1959 edition),

article 7, §2, only required notice in writing prior to a meeting which would consider transfers of real property. The General Counsel of the Greek Archdiocese of North and South America, Peter T. Kourides, testified that a new set of bylaws, although adopted before this meeting (September 17-24, 1960) did not go into effect until January 1, 1961. Thus the relevant set of bylaws for the October 23, 1960, meeting was the 1959 edition.

2. 1959 bylaws, article 18: "Regular meetings of the members of the parish shall be held twice each year . . . Special meetings shall be called whenever deemed necessary by the board of trustees, by one-third of the membership of the parish or by the president . . .".

3. 1959 bylaws, article 18(j) allows each parish to insert a number that will be required to form a quorum for the transaction of business. There is no testimony that the Philadelphia Community ever enacted any quorum requirement.

4. 1959 bylaws, article 7, §2: "The board of trustees shall have no power to purchase, mortgage, sell or assign real property without the consent of the members of the parish, obtained by a resolution adopted by a majority vote of at least two-thirds of the members present at a meeting of the general assembly of the parish convoked upon notice in writing and properly conducted. In addition thereto the concurrence of the mixed council shall be required."

5. 1961 bylaws, article VI, §2: "The board of trustees shall have no power to purchase, mortgage, sell or assign real property without the consent of two-thirds (2/3) of the members present at the general assembly. The members of the parish must be notified by certified mail at least fifteen (15) days prior to such general assembly of the agenda, date, time, and place of such meeting. Such consent of the members of the parish must then be submitted for approval to the

Archdiocesan Council. If approval is given, it is final and may be effected."

6. 1961 bylaws, article XVII, §2: "A general assembly shall consist of the members in good standing. Members in good standing having the right to vote shall be those members of the parish who have paid their dues prior to the general assembly. A regular member of the community, who is already enrolled in the parish register but who has neglected to pay his dues, may pay the same together with the Dekadollarion of the Archdiocese up to the day of the general assembly and thus participate therein. All new members have the right to vote at the general assembly of the parish if they have been members in good standing for at least three (3) months prior to the date of the general assembly."

7. 1961 bylaws, article XI, §11: "No election of the board of trustees will be ratified by the Archdiocese in the event that it can be proven that persons participated therein who had not paid their required parish dues and the Dekadollarion. In such an eventuality, the election will be declared void and a new election ordered."

8. 1959 bylaws, article 8: "Powers and Duties of the Parish Board of Trustees." §10: "It shall call meetings of the members of the parish and meetings of the board of trustees. It shall prepare a list of all members in good standing entitled to vote in the elections for trustees and shall post the same in a conspicuous place in the church sixty days prior to such elections.

1961 bylaws, article VII, §5: "The board of trustees shall keep the roll of the parish membership up-to-date, and on the basis of the members' qualifications shall post the list in a conspicuous place in the church 30 days before the elections."

9. 1959 bylaws, article 18(a) "Meetings of the Members of the Parish": "It shall keep a record of the

minutes of the proceedings, signed by the president, the secretary and the priest."

Cf. 1961 bylaws, article XV "Power and Duties of the Secretary": §4 "To co-sign with the president and the priest all documents of the parish."