The Presbytery of Beaver-Butler of the United Presbyterian Church in the United States of America et al., Appellants v. Middlesex Presbyterian Church et al., Appellees.

Argued October 3, 1983, before Judges ROGERS, CRAIG and DOYLE, sitting as a panel of three.

212

*Gregory M. Harvey,* with him *George W. McKeag* and *Elizabeth L. Hoop,* of counsel, *Morgan, Lewis & Bockius,* and *Lee C. McCandless, McCandless, Krizner & Price,* for appellants.

*Kenneth C. Kettering,* with him *Roger C. Weigand, Reed, Smith, Shaw & McClay,* and *James A. Taylor, Murrin, Murrin & Taylor,* for apellees.

*Tom P. Monteverde,* with him *Jean C. Hemphill, Monteverde, Hemphill, Maschmeyer & Obert,* for Amici Curiae, The Tenth Presbyterian Church of Philadelphia, The Presbyterian Church of Coatesville, The Faggs' Manor Presbyterian Church and J. R. Miller Memorial Presbyterian Church.

OPINION BY JUDGE ROGERS, February 10, 1984:

The question of this appeal is that of whether a majority of the members of the congregation of a local church, having decided to leave the denomina-

tion with which the local church has been in union, may retain possession and control of the property appertaining to the local church; or whether in such event possession and control of the property passes to the competent authorities of the denomination.

The question is not, unhappily, a stranger to courts. Because ecclesiastical controversies arouse strong feelings in the participants and because they come trailing the looming presence of the establishment and free exercise clauses of the First Amendment, courts approach them with diffidence and decide them to the accompaniment of dilatations. It is nevertheless as surely the duty of courts to protect the property rights of religious organizations as of other organizations which come before them.

The local church in this case was Middlesex United Presbyterian Church, an unincorporated congregation, located in Butler County. Middlesex United Presbyterian Church was affiliated with the Presbyterian Church in the United States of America from 1799 until 1958 when the latter merged with the United Presbyterian Church of North America to form the United Presbyterian Church in the United States of America, with which last denomination Middlesex United remained in all respects in union until the events of this case.

The real property used by the Middlesex United Presbyterian Church was in title to, and the personal property was in the charge of, a nonprofit corporation named Middlesex Presbyterian Church, the charter of which, obtained in 1907, provided that the members of the corporation should be members of the congregation of Middlesex United Presbyterian Church, that the trustees of the corporation should be lay members of that congregation and that the purpose of the corporation should be to worship "ac-

cording to the faith, doctrine, creed, discipline and usages of the Presbyterian Church in the United States of America," which denomination we learn was organized along the same lines as its successor by merger, the United Presbyterian Church in the United States of America.

On April 6, 1981, at a special meeting of the congregation, called by the pastor, 156 of the 271 members of the Middlesex United Presbyterian Church voted on a proposed resolution that Middlesex United Presbyterian Church should be disaffiliated from the United Presbyterian Church in the United States of America. The vote was 125 to 31 in favor of the resolution. The seceding members then took and retained control of the church's property consisting of a church edifice, a manse, a cemetery, about $14,000 in funds, and other personal property. They formed a new unincorporated local church congregation which they named Middlesex Presbyterian Church, thus dropping the word United. They also caused the charter of the nonprofit corporation, named Middlesex Presbyterian Church, which held title to the church property, to be amended so as to substitute for the statement of adherence to the discipline and usages of the Presbyterian Church in the United States of America, a clause reading that "this corporation shall always be separate and distinct from, and in no way subject to the United Presbyterian Church in the United States of America or any affiliate thereof including the Presbytery or any other entity of said denomination." We learn that the moderator and the seceding members of Middlesex United Presbyterian Church have joined the Presbyterian Church in America, a denomination unrelated to the United Presbyterian Church in the United States of America and one which we are told ex-

pressly disclaims any right to the property of local churches.

It is appropriate at this point to digress briefly to a description of the organization of the United Presbyterian Church in the United States of America, with which Middlesex United Presbyterian Church was affiliated. Its Constitution consists of two books, The Book of Confessions and The Book of Order. One of the three parts of The Book of Order is the Form of Government which describes the "system of union and the form of government and discipline." The Form of Government provides that congregations are governed by four judicatories, *i.e.*, governing bodies, called the Sessions of the local, or as Presbyterians say particular churches; Presbyteries; Synods; and a General Assembly.

Each particular church is immediately governed by its session consisting of the pastor, also called moderator, and ruling elders in active service. The session "is charged with maintaining the spiritual government of the congregation . . . [and] shall have authority over all of the affairs and activities of the particular church, except such matters as may, by this Form of Government, be specifically accorded to the pastor, to the congregation, or to a higher adjudicatory." The session is given "exclusive authority over the uses to which the church buildings and properties may be put." The Form of Government also provides that any difference between a session and a church congregation shall be resolved in favor of "the position of the session, as the body having superior responsibility for the welfare and program of the church, . . . unless reversed or modified by a higher judicatory."

A presbytery is composed of ministers and elders representing the particular churches within a geo-

graphical district. Its jurisdiction includes the power to receive and decide appeals from sessions and to "take effectual care that they observe the Constitution of the Church." The presbytery has the power to appoint a commission with the full power of a session composed of ministers and ruling elders to take the place of an existing session "[w]henever, after a thorough investigation, and after full opportunity to be heard has been accorded to the session in question, the presbytery of jurisdiction shall determine that the session of a particular church is unable or unwilling to manage wisely the affairs of its church."

A synod is the judicatory next superior to the presbytery and is composed of ministers and ruling elders of not fewer than three presbyteries. Its jurisdiction includes deciding appeals from decisions of presbyteries and its decisions are final on all questions other than those affecting doctrine or the interpretation of the Constitution.

The General Assembly is the highest judicatory and it consists of ministers and elders from each presbytery. It "shall receive all appeals, complaints, and references that affect the doctrine or the interpretation of the Constitution of the Church" and it has "the power of deciding . . . all controversies respecting doctrine and the interpretation of the Constitution of the Church."

Turning again to the history of this litigation, we record that the Presbytery of Beaver-Butler of the United Presbyterian Church in the United States of America, the judicatory having immediate authority over Middlesex United Presbyterian Church, responded to the secession of the moderator and some of the members by appointing an Administrative Commission to replace the local session with full powers of a session. Under the Form of Government the powers of a session include exclusive power over

the use to which church buildings and properties may be put.

The seceding members of Middlesex United Presbyterian Church refused the demand of the Administrative Commission to deliver up the property, and they changed the locks on the church buildings. The Administrative Commission has held church services in homes for the members of Middlesex United Presbyterian Church who did not withdraw; and those members have also attended services in other churches in union with the United Presbyterian Church in the United States of America.

The Presbytery of Beaver-Butler of the United Presbyterian Church in the United States of America, and the Administrative Commission appointed by the Presbytery,[1] then commenced this action in equity against the Middlesex Presbyterian Church, the new local church founded by the seceding members of the Middlesex United Presbyterian Church and against the moderator and other officers of the newly formed local church.

We will hereafter refer to the plaintiffs in the suit in the trial court, the appellants here, as UPCUSA, the acronym of the United Presbyterian Church in the United States of America, and to the defendants in the trial court, the appellees here, as Middlesex Presbyterian, the first two words in the name assumed by the seceding members, Middlesex Presbyterian Church.

The relief sought by the plaintiffs, described generally, is that the defendants be ordered to turn over the church property to the plaintiffs; that the defend-

---

[1] Also joined as plaintiffs were: Middlesex United Presbyterian Church in the United States of America, the unincorporated local congregation before the secession, the Beaver-Butler Presbytery, and Middlesex Presbyterian Church, the nonprofit corporation which was the record owner of the Middlesex United properties.

ants be enjoined from obstructing the Administrative Commission in its possession and administration of the church properties; and that the defendants be required to account for moneys of Middlesex United Presbyterian Church.

The chancellor, after hearing, entered a decree nisi dismissing the plaintiff, UPCUSA's, motion for summary judgment and granting the defendant, Middlesex Presbyterian's, motion for summary judgment. UPCUSA's exceptions were dismissed and the decree nisi was entered as the court's final order.

## I Pennsylvania Case Law

Pennsylvania adheres to the so-called deference principle for deciding this class of cases, that is, clashes over property between seceding members of the congregation of a local church on the one and the denomination of which the local church had been a part on the other.

*McGinnis v. Watson,* 41 Pa. 9 (1861), was, like this case, a dispute between a denomination organized in the Presbyterian manner and the local officers over the meeting house. The Pennsylvania Supreme Court held for the denomination, writing "that in general organizations of united churches, the law of the general organism is binding on all the individual churches, and that even a majority [of a congregation] seceding, lose all their rights in the church property." *Id.* at 30. In *Sutter v. Trustees of the First Reformed Dutch Church,* 42 Pa. 503 (1862), the Supreme Court reiterated the deference principle in deciding a dispute over local church property in favor of a presbyterian denomination and against the local seceders, on the authority of *McGinnis v. Watson, supra.*

The leading case and the acknowledged wellspring of the deference principle is *Watson v. Jones,* 80 U.S. (13 Wall.) 679 (1871). The suit was brought in the

federal courts on diversity jurisdiction. The facts of *Watson v. Jones* were materially identical to those of the case at hand down to the fact that the denomination was presbyterian. The Supreme Court of the United States held that where property is held by a religious congregation which is a subordinate member of a general church organization in which there are superior tribunals, with a general power of control more or less complete in some supreme judicatory over the whole membership of the general organization, and a question is raised in a civil court as to the possession and control of the church property, which question has been decided by the highest of the judicatories of the several organizations to which the matter has been presented, the civil courts must accept such decision as final and binding on them. The Supreme Court of the United States cited as authority for its holding, *McGinnis v. Watson, supra,*[2] and in turn much later the Supreme Court of Pennsylvania referred to *Watson v. Jones, supra,* as the landmark statement of the deference principle. *St. Michael and*

---

[2] The *Watson* court also cited as authority for the deference principle the case of *German Reformed Church v. Seibert,* 3 Pa. 282 (1846). This case dealt not with property but with the excommunication of a member. The Supreme Court of Pennsylvania held first, that civil courts must accept the decisions of the tribunals of the denomination and second, that the excommunicated member could not sue in mandamus until there had been a final adjudication by the denomination judicatories. The court in *Seibert* wrote "civil courts, if they should be so unwise as to attempt to supervise their [ecclesiastical courts] judgments on matters which come within their jurisdiction, would only involve themselves in a sea of uncertainty and doubt, which would do anything but improve either religion or good morals." *Id.* at 291. Similar expressions have appeared in the cases and in learned writings in support of continued adherence to the deference principle and in opposition to neutral principles down the years. *See* Adams and Hanlon, *Jones v. Wolf: Church Autonomy and the Religious Clauses of the First Amendment,* 128 U. of Pa. L. Rev. 1291, 1326 (1980).

*Archangel Russian Orthodox Greek Catholic Church v. Uhniat*, 436 Pa. 222, 234, 259 A.2d 862, 867 (1969), *cert. denied*, 400 U.S. 823 (1970).

Some of the many Pennsylvania cases applying the deference principle accepting as binding the decisions of the judicatories of the hierarchical denominations are:

*Sutter v. The Trustees of the First Reformed Dutch Church*, 42 Pa. at 512 (1862): "[t]he majority [of a local congregation] may direct and control consistently with the particular and general laws of the organism, but not in violation of them."

*Schnorr's Appeal*, 67 Pa. 138, 148 (1870) (WILLIAMS, J., concurring): "a majority of a church congregation may direct and control in church matters consistently with the particular and general laws of the organism or denomination to which it belongs, but not in violation of them, and that in church organizations those who adhere and submit to the regular order of the church, local and general, though a minority are the true congregation and corporation, if incorporated."

*Morris v. Featro*, 340 Pa. 354, 360, 17 A.2d 403, 406 (1941): "St. John's Church was organized and dedicated as and is a Greek Catholic Church united with Rome. . . . It follows that the control, disposition and management of the property of this church, as well as other ecclesiastical matters, are subject to and are exclusively governed by the laws, canons, rules and regulations of such church."

*Church of God v. Church of God*, 355 Pa. 478, 484, 50 A.2d 357, 360 (1947): "[a] local church congregation which is part of a larger religious organization cannot divorce or separate itself from the church family, set up a new independent organization, and by so doing entitle itself to retain the congregational property."

*Pilgrim Holiness Church v. Pilgrim Holiness Church of Athens Township*, 436 Pa. 239, 241-242, 259 A.2d 870, 871 (1969): "[i]t is unquestionably generally correct that if a church organization is organized and holds its property as a constituent part of any particular religious denomination, it cannot sever itself from such religious denomination without forfeiting its rights and property to the parent denomination."

*Western Pennsylvania Conference of United Methodist Church v. Everson Evangelical Church*, 454 Pa. 434, 437, 312 A.2d 35, 37 (1973): "[i]t has long been established in Pennsylvania that when a local church is a member of and subscribes to the doctrine and control of a hierarchically governed denomination, it cannot sever itself from such religious denomination without forfeiting its property to the parent denomination."

In sum, the case law of Pennsylvania is that where property is held by a local church congregation which is a member of a general church organization, or denomination, in which there are superior tribunals with a supreme judicatory, *i.e.* a denomination with a hierarchical form of government, and the question is raised in a civil court over property, which question has been decided by the highest of the judicatories to which it has been presented, the civil courts must accept such decision as final and binding on them.

## II  The Act of 1935, P.L. 353

The Pennsylvania rule of deference has also been instituted by statute. By Act of June 20, 1935, P.L. 353, 10 P.S. §81, the Legislature amended Section 7 of the Act of April 26, 1855, P.L. 328 (sometimes called the Lay Control of Church Property Act), to read as follows:

Wheresoever any property, real or personal, has heretofore been or shall hereafter be bequeathed, devised or conveyed to any ecclesiastical corporation, bishop, ecclesiastic, or other person, for the use of any church, congregation, or religious society, for or in trust for religious worship or sepulture, or for use by said church, congregation, or religious society, for a school, educational institution, convent, rectory, parsonage, hall, auditorium, or the maintenance of any of these the same shall be taken and held subject to the control and disposition of such officers or authorities of such church, congregation, or religious society, having a controlling power according to the rules, regulations, usage, or corporate requirements of such church, congregation, or religious society, which control and disposition shall be exercised in accordance with and subject to the rule and regulations, usages, canons, discipline and requirements of the religious body, denomination or organization to which such church, congregation, or religious society shall belong, but nothing herein contained shall authorize the diversion of any property from the purposes, uses, and trusts to which it may have been heretofore lawfully dedicated, or to which it may hereafter, consistently herewith, be lawfully dedicated.

Quite simply, the statute provides that local church property is to be held and controlled according to the rules, regulations or corporation requirements of the organization to which the local church belongs. The Supreme Court of Pennsylvania has without deviation held that the statute requires that properties attached to seceding local churches formerly in

union with hierarchically governed denominations remain with the denomination. In *St. Michael and Archangel Russian Orthodox Greek Catholic Church v. Uhniat*, 436 Pa. at 238, 259 A.2d at 869 (1969), *cert. denied*, 400 U.S. 823 (1970), the court wrote: "Apart from the decisional law discussed . . . , the Lay Control of Church Property Act, supra, requires that the property of St. Michael's church remain subject to the control of the Patriarchate. Construing that act in Canovaro v. Brothers of The Order of Hermits of St. Augustine, 326 Pa. 76, 191 A. 140 (1937), we held that a local church cannot sever its relation with the ecclesiastical body under whose direction it was organized and with which it has continually been affiliated without the consent of such ecclesiastical body. See also, Kraftician v. Greek Catholic Congregation, 366 Pa. 431, 77 A.2d 875 (1951) and Gabster v. Mesaros, 422 Pa. 116, 220 A.2d 639 (1966)."

The holding of *Church of God v. Church of God*, 355 Pa. at 484, 50 A.2d at 360, was that "[t]he law of this Commonwealth concerning the control and disposition of property owned by religious societies that are units of a denominational system is embodied in the Act of April 6, 1855, P.L. 328, as last amended by the Act of June 20, 1935, P.L. 353, 10 P.S. 81, by the terms of which the control of any local congregation over property conveyed to its use is to be exercised in accordance with and subject to the rules, regulations, usages, canons, discipline, and requirements of the religious body, denomination, or organization to which the local congregation belongs."

In *Canovaro v. Brothers of The Order of Hermits of St. Augustine*, 326 Pa. at 76, 87-88, 191 A. 140, 146-147 (1937), it was declared that "[t]he long established and deeply imbedded policy of entrusting the ultimate power of control and disposition of church

property to the laity subject to the uses for which it was dedicated was uprooted by the Act of 1935. . . . The effect of this statute is to make supreme the internal rules, regulations and usages of religious societies respecting control of their properties."

UPCUSA is a hierarchically governed denomination. Not only do the cases so hold; it has been used as the example of a hierarchical denomination. *Pilgrim Holiness Church v. Pilgrim Holiness Church of Athens Township,* 436 Pa. at 242 n.2, 259 A.2d at 872 n.2.

As we have earlier recorded, the Presbytery of Beaver-Butler, the judicatory next superior to the session of Middlesex United in the UPCUSA hierarchy of judicatories, and vested with power to take effectual care of the sessions under its charge, appointed an Administrative Commission to supercede the refractory Middlesex United session. The Administrative Commission demanded possession and control of the church property and was rebuffed. These actions constituted a decision by Beaver-Butler Presbytery, the highest judicatory of UPCUSA to which this matter was presented. As we have demonstrated, the law of Pennsylvania, both of the cases and by statute, is that the civil court was bound to accept the Presbytery's decision as final and binding. It follows that the common pleas court erred in entering judgment in favor of the local church; and that its judgment must be reversed.

### III   Constitutional Considerations

As we have observed, federal jurisdiction in *Watson v. Jones, supra,* was founded on diversity of citizenship. It may be assumed that the United States Supreme Court in adopting the deference principle chose a principle which it found to be in conformity

with the establishment of free exercise clauses of the First Amendment.

After 1868, when the Fourteenth Amendment made the First Amendment applicable to the states, federal courts employed the deference principle of *Watson v. Jones, supra,* although that case was decided without explicit reference to the free exercise or establishment clauses.

*Barkley v. Hayes,* 208 F. 319 (D. Mo. 1913), *aff'd sub nom. Duvall v. Synod of Kansas,* 222 F. 699 (8th Cir. 1915), *aff'd sub nom. Shepard v. Barkley,* 247 U.S. 1 (1918) was litigation over property between UPCUSA's predecessor, the Presbyterian Church in the United States of America and the Cumberland Presbyterian Church in which the former claimed the right to possession and control of Cumberland's properties. The district court decided that the union of the two bodies had been regularly effected and that the ownership of the properties passed to the Presbyterian Church in the United States of America. The Supreme Court affirmed the circuit court declaring that "without any difference on the subject the court is of the opinion that the doctrines by which the case is controlled have been so affirmatively and conclusively settled by a prior decision of this court as to cause it to be unnecessary as a matter of original consideration, to restate them. Watson v. Jones, 13 Wall. 679, 20 L.Ed. 666. And the want of any possible reason for removing this case from the control of the doctrines of the Watson Case is, if needs be, conclusively shown by the many cases cited by the court below . . . in which the Watson Case was made controlling and decisive as to controversies not in substance differing from this one." 247 U.S. at 1.

In *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America,* 344 U.S. 94

(1952), American churches affiliated with the Russian Orthodox Church sued to recover possession of the New York Cathedral. The Supreme Court reversed decision of the New York Court of Appeals to the effect that the plaintiffs were not entitled to judgment by virtue of a New York statute undertaking to transfer control of the local churches from the control of the governing hierarchy located in Russia, because the statute violated the free exercise clause. On the authority of *Watson v. Jones, supra,* the Supreme Court held that the controversy concerning who had the right to use St. Nicholas Cathedral was a matter of ecclesiastical government with the result that the courts were bound to accept the decision of the Supreme Church Authority of the Russian Orthodox Church. Mr. Justice FRANKFURTER in a concurring opinion wrote:

> The judiciary has heeded, naturally enough, the menace to a society like ours of attempting to settle such religious struggles by state action. And so, when courts are called upon to adjudicate disputes which, though generated by conflicts of faith, may fairly be isolated as controversies over property and therefore within judicial competence, the authority of courts is in strict subordination to the ecclesiastical law of a particular church prior to schism. Watson v. Jones, 13 Wall. 679, 20 L.Ed. 666. This very limited right of resort to courts for determination of claims, civil in nature, between rival parties among the communicants of a religious faction is merely one aspect of the duty of courts to enforce the rights of members in an association, temporal or religious, according to the laws of that association. . . .

*Id.* at 122.

In *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440 (1969), the facts and issues were again materially identical to those of this case. The state court applied what was described to be the law of Georgia to the effect that there was an implied trust of local church property for the benefit of the several churches on condition that the latter adhere to its tenets and practices at the time of affiliation. A jury was asked to hear and decide whether the general church had or had not departed from the true doctrine of the faith. The jury found for the local churches and the judgment thereon was affirmed by the Georgia Supreme Court. The United States Supreme Court reversed and remanded, holding on the authority of *Watson v. Jones, supra,* that civil courts have no role in determining ecclesiastical questions. Mr. Justice BRENNAN for the court wrote:

> Thus, the First Amendment severely circumscribes the role that civil courts may pay in resolving church property disputes . . . Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which, can be applied without "establishing" to which property is awarded.

*Id.* at 449.

In recent cases the catchy phrase "neutral principles" has been attached to an approach to church disputes different from the deference principle of *Watson v. Jones, supra,* and *Watson's* Pennsylvania precursor, *McGinnis v. Watson, supra.* In *Maryland & Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc.,* 396 U.S. 367 (1970), the Supreme Court of the United States dis-

missed the appeal of a denomination from a decision of the Maryland courts in favor of the local church decided by the Maryland courts, not on the deference principle, but on neutral principles, consisting of an examination of state statutory law, language in deeds, and terms of the church constitution. The Supreme Court of the United States, per curiam, held that since the Maryland court had in fact resolved the dispute without inquiry into religious doctrines there was no violation of the First Amendment. Mr. Justice BRENNAN in a concurring opinion expressed the view that states may adopt any one of various approaches to resolve church property disputes so long as there is no inquiry into religious law or usage. He described as proper means the deference principle; neutral principles; or as a possibility, the passage of special statutes governing church property arrangements.

We come finally to *Jones v. Wolf*, 443 U.S. 595 (1979). Here the issue was that of whether a civil court might use the neutral principles approach to resolve church property disputes involving a hierarchical denomination or whether the use of the deference principle was required in the case of a hierarchical denomination. The Court decided by a vote of five to four that the neutral principles approach may be employed so long as the court's considerations do not include matters of doctrine or usage. The difference between the majority and dissenters was not over the propriety of the use of the deference principle; it was over whether the neutral principles approach might be used as well as the deference principle in the case of a hierarchical denomination.

IV   The Decision of the Court of Common
Pleas

The chancellor filed an inadequate memorandum opinion and decree nisi granting Middlesex Presby-

terian's motion for summary judgment; the court en banc dismissed UPCUSA's exceptions and entered the decree nisi as a final order.

The chancellor acknowledged that the deference principle applied to disputes between local churches and hierarchical denominations and that the UPCUSA is a hierarchical denomination. Having so concluded, the chancellor should have, as the deference principle requires, accepted as binding the decision of the highest tribunal of UPCUSA to decide the matter, the Presbytery of Beaver-Butler. Instead, the chancellor declared that "the single issue on which this litigation turns is whether UPCUSA's concededly hierarchical form of organization with respect to doctrine and belief extends to property matters." The chancellor then turned to *Jones v. Wolf, supra,* and described that case as authorizing the use of neutral principles. The chancellor also wrote that "[u]nder either the deference rule or neutral principles of law approach, a trust can be enforced only if the internal laws of the denomination create one" and referred to two decided cases, one an appellate court decision from California and the other a trial court decision from Maryland, as persuasive. California and Maryland employ the neutral principles approach. The chancellor then concluded "[a]fter a thorough examination of the relevant statutes, property deeds, and UPCUSA Constitution, it cannot be said such a trust [to UPCUSA] was ever created."

Thus, without citation of Pennsylvania cases or the Act of 1935, the chancellor declined to defer to the decision of the Presbytery and decided the issue based on his examination of the deeds and UPCUSA's Constitution. As we have demonstrated, Pennsylvania adheres to the deference principle which, applied in this case, plainly requires acceptance of the decision of the Presbytery.

## V The Application of Neutral Principles
to This Case

As we have seen, the neutral principles approach is that of examination of the relevant statutes, title deeds, and church constitutions for evidence of the creation of a trust of local church property for the benefit of the denomination.

The Act of 1935 provides that the control of local congregations over property is subject to the regulations and requirements of the denomination of which it is a part. *Church of God v. Church of God, supra.* Thus, Pennsylvania has anticipated Mr. Justice BRENNAN's suggestion in *Maryland & Virginia Eldership of the Churches of God at Sharpsburg, Inc., supra,* as a possibility, of the passage of special statutes governing church property arrangements. In any event neutral principles include consideration of the applicable statutes and the applicable Pennsylvania statute requires that the Presbytery decision be upheld.

The title deeds to Middlesex Presbyterian Church contain no trust language.

The charter of the nonprofit corporation attached to Middlesex United Presbyterian Church declares that the purpose of the corporation was to "worship Almighty God according to the faith, doctrine, creed, discipline and usages of the Presbyterian Church of the U.S.A." We learn that the Form of Government of the Presbyterian Church of the U.S.A. was the same as that of UPCUSA. What does that Form of Government provide concerning the property of local or particular church property?[3] In the case of a

---

[3] We record that the constitution of UPCUSA at the time of the events of this case did not explicitly provide that upon the secession of the congregation, the local church property remains with the UPCUSA; but that it has since been amended to so pro-

formal dissolution or extinction of a particular church, its properties shall be held, used and applied to such uses as the presbytery should direct or sold by the presbytery. Form of Government Section 62.11. The particular church may not sell, mortgage, encumber, or lease real property without permission of the presbytery. Form of Government Section 62.12. The Presbytery, after an investigation and an opportunity to be heard is given to the particular church's session, may determine that the session of the particular church is unable or unwilling to manage wisely the affairs of its church and appoint an Administrative Commission to take charge of the particular church with full power of a session. Form of Government Section 41.15. Every session has "exclusive authority over the uses to which the church buildings and properties may be put" and to delegate this responsibility to the trustees of the adjunct nonprofit corporation subject to the "superior authority and direction of the session." Form of Government Section 41.07-.08. Finally, trustees, the name given the officers of the nonprofit corporation holding title to

---

vide. This point and the fact that amendments of UPCUSA's constitution to the same effect had been proposed and defeated in the past are advanced by the appellees as strong evidence, presumably to be employed with other neutral principles, that the constitution should be construed as providing that UPCUSA has no right to retain the property. We do not agree that these circumstances should have that effect. As we note later in the body of this opinion, there were other limitations on the local churches' use and control of the property imposed by UPCUSA's constitution which did forbid, and have been construed by the Court of Appeals of Maryland under neutral principles as having forbidden, the alienation of its property by a withdrawing local church. The fact that the constitution was amended so as to make it explicit that local churches might not retain church property after withdrawing from UPCUSA, does not compel the conclusion that other provisions did not already so provide.

local church property "shall deal with such property only as they may be authorized or directed by the session." Form of Government Section 62.08. In our view, these provisions are at least sufficient to support a conclusion that local church property cannot be alienated from the denomination by the congregation without permission of the Presbytery and this was what was done in this case.

The State of Maryland adheres to the neutral principles approach and, it will be recalled, the chancellor cited a Maryland trial court decision as persuasive that no trust for UPCUSA existed in the circumstances of this case. *Babcock Memorial Presbyterian Church v. The Presbytery of Baltimore of the United Presbyterian Church in the United States,* Md.     , A.2d     (No. 102 September Term 1982, filed August 17, 1983) is the final judgment in the case cited by the chancellor. The Maryland Court of Appeals there decided the appeal of the local church from a decision of the intermediate appellate court, the Court of Special Appeals, reversing the trial court's decision that UPCUSA had a congregational polity with respect to use of local church property so that the seceding congregation of the local church could lawfully give the church property to another congregation. The Court of Appeals, applying neutral principles, concluded that the intermediate appellate court had correctly decided that there was a trust in the property for the uses of UPCUSA based on Sections 62.08, 62.11, 62.12 of UPCUSA's Form of Government and the provisions of the by-laws of the local church acknowledging its allegiance to UPCUSA. We find no important difference in the circumstances in *Babcock* and those in this case, except that in this case there is the Act of 1935 which further supports, if it does not make conclusive, the thesis that even

under neutral principles the judgment here should have been for UPCUSA.

For these reasons we are constrained to enter the following:

ORDER

AND Now, this 10th day of February, 1984, the final decree of the Court of Common Pleas of Butler County made June 21, 1982 is reversed; and the record is remanded with direction that summary judgment be entered in favor of the appellants herein and against the appellees and that appropriate injunctive relief be granted the appellants upon their application. Such relief shall include an order that the appellees shall deliver to the Administrative Commission appointed by the Presbytery of Beaver-Butler of the United Presbyterian Church in the United States of America all assets, funds and property, real and personal, of the Middlesex United Presbyterian Church.

Judge MACPHAIL did not participate in this decision.