513 A.2d 531

## Presbytery of Donegal et al., Appellants *v.* S. Reed Calhoun et al., Appellees.

Argued December 11, 1985, before President Judge CRUMLISH, JR., Judges ROGERS, CRAIG, DOYLE, COLINS and PALLADINO.

*Gregory M. Harvey,* with him, *Elizabeth L. Hoop* and *George W. McKeag,* of Counsel: *Morgan, Lewis and Bockius,* and *P. Richard Klein, Klein, Elicker, Head & Knauer,* for appellants.

Tom P. *Monteverde,* with him, *Jean C. Hemphill, Monteverde, Hemphill, Maschmeyer & Obert,* for appellees.

OPINION BY JUDGE DOYLE, July 29, 1986:

The case before us involves a property dispute between a local church congregation and its parent denomination. The denomination, represented by the Presbytery of Donegal (Presbytery), filed an action in equity with the Court of Common Pleas of Chester County requesting that title be transferred to it to the real property under the control of the local church congregation known as the Coatesville Presbyterian Church (Coatesville Church). The Presbytery appeals to this Court from the trial court's dismissal of that action.

The Coatesville Church was established as a local congregation in 1832, and in 1833 voluntarily affiliated with the New Castle Presbytery, a predecessor of the Presbytery of Donegal. Between the years 1845 and 1958, Coatesville Church acquired real estate upon which it constructed its present church, manse, and education building. The acquisition of the properties, and the improvements thereon, were funded exclusively by the members of the local congregation, and prior to 1979, title to all property was at all times held by a board of trustees of a corporation made up of the members of the local congregation.

The Presbytery is part of a nationwide denomination known as the United Presbyterian Church in the United States of America (UPCUSA).[1] Under the constitu-

---

[1] UPCUSA is the result of a 1958 merger between the United Presbyterian Church of North America and the Presbyterian Church in the United States of America. In 1983 the UPCUSA merged with the Presbyterian Church in the United States and is now known as the Presbyterian Church (U.S.A.).

tion of the denomination, each local congregation is governed by a session, composed of members elected by the congregation, who are known as elders. In addition, authority in certain matters is delegated to a series of higher governing bodies, such as the Presbytery and the Synod, composed of an equal number of elders and ministers from each church in a given geographical area. In a similar fashion, the highest governing body, the General Assembly, consists of representatives from each presbytery in the denomination.

In the fall of 1979, Coatesville Church became aware that the denomination intended to initiate proceedings to amend its constitution so as to impose a trust upon all congregational property in favor of the denomination.[2] In light of previous doctrinal disagreements it had with the denomination, the session of the Coatesville Church became concerned that the new amendment would prevent it from retaining the property should it feel compelled to leave the denomination at some time in the future. Out of this concern the session called a joint meeting of the congregation and the corporation, and proposed that the church transfer its assets to an independent corporation, known as the Coatesville Presbyterian Foundation, which would then lease back the property for one dollar per year for a period of 99 years. The proposal was overwhelmingly approved by the members present on October 28, 1979, and on November 2, 1979, the assets were transferred to the Foundation, with immediate lease back.

On November 20, 1979, the Presbytery appointed an administrative commission to investigate the actions taken by the Coatesville Church. Joint meetings were held between the Presbytery's commission and the ses-

_____
[2] This amendment was adopted by the denomination on May 27, 1981.

sion, at which time the session assured the commission that it did not intend to leave the denomination. In spite of these assurances, it became apparent that the Presbytery intended to take whatever legal action was necessary to rescind the property transfer. For this reason the session of the Coatesville Church became convinced that it would be unable to retain control of its property unless it disaffiliated itself with the denomination immediately. Accordingly, on February 24, 1980, after a number of congregational meetings had been held on the session's proposal, the congregation resolved by a vote of 442 to 65 to terminate the congregation's relationship with the Presbytery and the denomination.

Thereafter on March 18, 1980, the Presbytery appointed a second administrative commission giving it complete power to act as the session of the Coatesville Church, thus purporting to replace the elected session of the church.[3] The elected session of the Coatesville Church remained in control of the church property, however, and refused demands by the Presbytery's commission for access to church records, contending that it was no longer associated with the Presbytery and was not under its authority.

The Presbytery filed an action in equity with the Court of Common Pleas of Chester County requesting

---

[3] Chapter XI, Section 15 of the Form of Government of the UPCUSA provides:

Whenever, after a thorough investigation, and after full opportunity to be heard has been accorded to the session in question, the presbytery of jurisdiction shall determine that the session of a particular church is unable or unwilling to manage wisely the affairs of its church, the presbytery may appoint a commission composed of ministers and ruling elders, with the full power of a session. This commission shall take the place of the existing session, if any, which shall cease to act until such time as the presbytery shall otherwise direct.

that its commission be given title to, and control over, all church assets retained by the Coatesville Church. After extensive testimony was presented, the trial court entered a comprehensive adjudication and decree, including 77 findings of fact and 14 conclusions of law, in which it found in favor of the local congregation, concluding that there was no language in any of the relevant deeds or constitutions which would have created an express or implied trust in the church property in favor of the denomination. The Presbytery appeals the trial court's final decree which dismissed the Presbytery's motion for post trial relief.

Subsequent to the filing of this appeal, the Pennsylvania Supreme Court issued its opinion in *Presbytery of Beaver-Butler v. Middlesex Presbyterian Church,* 507 Pa. 255, 489 A.2d 1317 (1985), *cert. denied,*     U.S.     , 106 S. Ct. 198 (1986). As in the present case, *Middlesex* involved the issue of whether a local congregation of the UPCUSA denomination held its property in trust for the denomination, and could not, therefore, retain it upon disaffiliation from the denomination. In reversing the decision of the Commonwealth Court, the Pennsylvania Supreme Court found that this Court erred in resolving the issue by deferring to the decision of the highest governing body in the church. The Supreme Court held that this approach, which followed the "deference rule" set forth in *Watson v. Jones,* 80 U.S. 679 (1872), applied only in cases where the dispute was doctrinal in nature. The Supreme Court concluded:

> All disputes among members of a congregation, however, are not doctrinal disputes. Some are simply disputes as to meaning of agreements on wills, trusts, contracts, and property ownership. These disputes are questions of civil law and are not predicated on any religious doctrine. While it is true that parties may agree to settle

their disputes according to their own agreed fashion, the question of what they agreed to, or whether they agreed at all, are not doctrinal and can be solved without intruding into the sacred precincts. From this consideration has evolved what is called the 'neutral principles approach' delineated in Presbyterian Church in the United States v. Blue Hull Memorial Church, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed. 2d 658 (1969), where the rule was carefully announced.

*Id.* at 261-62, 489 A.2d at 1320-21. Applying the rule in *Blue Hull Memorial Church* to the facts of the case, the *Middlesex* court concluded that there was no evidence presented from which an intention to create a trust in favor of the denomination could be found. *Id.* at 269-70, 489 A.2d at 1324-25. Clearly, the *Middlesex* opinion established the "neutral principles approach" as the method by which to resolve church *property* disputes, even among churches with established "hierarchical" governing systems.

In the present case, although the trial court was without the benefit of the *Middlesex* opinion, it nonetheless correctly anticipated the holding of the Supreme Court in *Middlesex,* and applied neutral principles of contract and deed interpretation to resolve the property dispute.[4] The Presbytery has filed a supplemental brief with this Court acknowledging the authority of *Middlesex,* but suggesting nonetheless that applying the "neutral principles approach" to the present case should result in a decision in its favor. The Presbytery points to certain language in the UPCUSA constitution and in the local church charter which the

---

[4] Indeed, the opinion in *Middlesex* made explicit reference to the trial court's use of the neutral principles approach in the present case. *Id.* at 266 n.5, 489 A.2d at 1323 n.5.

Presbytery contends distinguishes the facts of this case from *Middlesex* and compels a conclusion that the property was held in trust for the denomination. The Presbytery first contends that the trial court erred in failing to find that various provisions of the denomination's constitution created a trust in the local property for the benefit of UPCUSA. Although at no time during the Coatesville Church's affiliation with UPCUSA did the denomination have any express trust language in its constitution, the Presbytery relies on the constitution's Book of Order which provided that a particular church could not sell, mortgage, encumber, or lease real property without permission of the presbytery.[5] In addition, the constitution permitted a presbytery to appoint an administrative commission to replace the local session whenever the presbytery determined that the session is unable or unwilling to manage wisely the affairs of its church.[6]. In this Court's opinion in *Presbytery of Beaver-Butler v. Middlesex Presbyterian Church*, 80 Pa. Commonwealth Ct. 211, 471 A.2d 1271 (1984), *reversed*, 507. Pa. 255, 489 A.2d 1317 (1985), we cited these same provisions, and although our holding in favor of the denomination was based on the application of the "deference rule" of *Watson*, we opined that these constitutional provisions would compel a similar result under the neutral principles approach. In reversing our decision, however, the Supreme Court specifically rejected the suggestion that these provisions created a trust, stating:

---

[5] Chapter XXXII, Section 12 of the Form of Government provides:

A particular church shall not sell, mortgage or otherwise encumber any of its real property and it shall not acquire real property subject to an encumbrance or condition without the written permission of the presbytery transmitted through the session of the particular church.

[6] *See supra*, note 3.

> The Commonwealth Court's reliance on selected passages from the Book of Order was misplaced in that the court ignored the overall intent of that book as a means of overseeing the *spiritual* development of member churches. In addition, these selected provisions, which at most evidence the putative trustee's desired interpretation, are far from constituting the clear unequivocal evidence necessary to support a conclusion that a trust existed.

507 Pa. at 269-70, 489 A.2d at 1325 (emphasis in original). We are bound by the Supreme Court's determination on this matter and must conclude that the identical provisions of the constitution cited in the present case do not support a conclusion that a trust existed.

The Presbytery challenges the trial court's determination that the transfer of the Coatesville Church's property to an independent foundation was not a "sale, mortgage, or encumbrance" of the property such as would require approval of the Presbytery. Whether or not the Coatesville Church was permitted to make such a transfer under the UPCUSA constitution, however, is no longer relevant, since the Coatesville Church has since disaffiliated itself from the denomination. Since the trial court found that the UPCUSA constitution neither prevented nor penalized member churches from unilaterally disaffiliating from the denomination, there is no question that the Coatesville Church's vote to leave the denomination was effective and terminated the authority that the denomination had over it. Thus, the narrow issue is not whether this constitutional provision invalidates the transfer, but whether it constitutes evidence of an intention to create a trust. In a similar fashion, the fact that the constitution permits the Presbytery to appoint an administrative commission to

replace the session is likewise relevant only to the issue of the creation of a trust. Since the Presbytery's action in appointing the commission was subsequent to the Coatesville Church's disaffiliation with the denomination, it is clear that the commission was without the authority to control the disposition of the congregation's property. As stated earlier, as to the issue of whether these constitutional provisions create a trust, we are bound by the Pennsylvania Supreme Court's determination on this matter.

The Presbytery also relies on a corporate charter of the Coatesville Church, written in 1866, which at the time of the disaffiliation stated:

[A]ny member of the Church or Congregation who shall disclaim or refuse conformity to the . . . authority [of the New Castle Presbytery, the Synod of Philadelphia, and the General Assembly of the Presbyterian Church in the United States of America] shall cease to be a member of the Corporation and shall not vote at any election or exercise any office or function concerning or connected with the said Church Corporation, nor shall the said connection of this Church or Congregation ever be transferred to any other body on pain of forfeiture of the Real Estate and other property held by the said Presbyterian Church in its corporate capacity to the Trustees of the General Assembly of the Presbyterian Church in the United States of America. . . .

The trial court found that the Coatesville Church was not aware of this charter provision until after it disaffiliated, at which time the charter was immediately amended to eliminate the language. In refusing to find that the language created a trust in favor of the denomination, the trial court noted that the charter provision was self-imposed, and could have been deleted at any

time prior to the church's disaffiliation. In addition, the trial court reasoned that the Presbytery was estopped from relying on the language because it never brought the language to the local church's attention and never asserted any claims based on the charter.

After a careful consideration of the record, we must agree with the trial court that the Coatesville Church should not be bound by this charter language. First, as the trial court correctly noted, the language was completely self-imposed, and was not the result of any agreement with the denomination, nor of any obligation imposed by it. Indeed, the Presbytery now contends that it did not even know of the charter provision prior to trial, and thus could not have brought it to the attention of the local church. Secondly, the provision was one of many in the charter of which the church was unaware, and had failed to follow. It is clear that this provision, along with other obsolete or outdated provisions would have been deleted by amendment had the Church been aware of their existence. Under these circumstances, the fact that the amendment was not made until after the disaffiliation is understandable, and should be excused. A similar situation occurred in *Middlesex*, where the local church amended its charter to delete language binding it to the "faith, doctrine, creed, discipline and usages" of the denomination, but did so *after* it had disaffiliated from the denomination. *See Middlesex*, 80 Pa. Commonwealth Ct. at 213-14, 471 A.2d at 1272-73, *reversed*, 507 Pa. 255, 489 A.2d 1317 (1985). We must therefore conclude that the church did not forfeit its property upon disaffiliation with the denomination.

The question still remains, however, whether the charter language formerly in the charter is evidence of an irrevocable trust to the benefit of the denomination. The Pennsylvania Supreme Court has emphasized that

in order for a court to find a trust has been created, there must exist clear and unambiguous language or conduct evincing the intent to create a trust. *Middlesex,* 507 Pa. at 268-69, 489 A.2d at 1324.

> [L]ack of formality does not obviate the necessity for the appearance of all the elements of a completed trust. Every trust symptom must be present, regardless of informality surrounding the inception of the relationship, or none exists. A trust must be created by clear and unambiguous language or conduct, it cannot arise from loose statements admitting possible inferences consistent with other relationships.

*Id.* at 269, 489 A.2d at 1324, *quoting Bair v. Snyder County State Bank,* 314 Pa. 85, 171 A. 274 (1934). It is clear that the charter language was not intended to create a present interest in the real estate in favor of the denomination; it simply provided for a forfeiture of property to the denomination upon the occurrence of a certain event. The provision did not create a trust but rather provided a means by which to insure the congregation's obedience to the denomination. It is significant to note that throughout the period in which the charter language was present the church continued to hold title to all property in its own corporate name, with no indication in its deeds that it was held in trust for the denomination. We must therefore conclude that the local church did not convey, or intend to convey, any property interest of the congregation to the denomination by means of a trust.

Finally, the Presbytery contends that the trial court based its decision on its own interpretation of religious doctrine and concluded that the Coatesville Church was more "Christian" than the Presbytery. The Presbytery bases its contention on the prefatory remarks in the court's opinion. We do not believe these remarks reflect

a decision by the trial court to resolve the case on religious doctrine. The remarks were prefatory only. As indicated earlier, the trial court reached its decision by analyzing the language of the relevant constitution, contracts, and deeds. Thus, its decision reflects the "neutral principle approach" adopted in *Middlesex*. We do not believe these introductory remarks taint an otherwise correct legal decision.

For the foregoing reasons we conclude that the trial court was correct in awarding judgment in favor of the Coatesville Church. Accordingly, we affirm its order.

ORDER

NOW, July 29, 1986, the order of the Court of Common Pleas of Chester County, No. 78, Term 1980, dated June 18, 1984, is hereby affirmed.

Judge MACPHAIL did not participate in this decision.